UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA,                          :

                  v.                              :          Indictment No.
                                                         19-cr-0064 (GHW)
                                                         :

NATALIE MAYFLOWER SOURS EDWARDS,                   :

               Defendant.                       :

-----------------------------------------------------------------x


## **SENTENCING MEMORANDUM**


Stephanie M. Carvlin
Counsel for Natalie Mayflower Sours Edwards
140 Broadway, Suite 4610
New York, New York   10005
212-748-1636

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT**………………………………………………..1

    I.  **DR.  SOURS EDWARDS' HISTORY AND CHARACTERISTICS**….….……4

    II. **THE OFFENSE CONDUCT**………………………………….…………36

    III. **THE GUIDELINE RANGE AND AVAILABLE SENTENCES**……….…...53

    IV. **OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT**................................................................................53

    V. **WHAT SENTENCE IS APPROPRIATE IN THIS CASE**..........................54

**CONCLUSION**………………………………………….………..……….....57

## <u>TABLE OF AUTHORITIES</u>

**<u>Statutes</u>**

18 U.S.C. §3553(a)............................................................................3, 54

31 U.S.C. §§5311-5314......................................................................37, n10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA,                    :

                 v.                    :        Indictment No.
                                                   19-cr-0064 (GHW)

                                             :

NATALIE MAYFLOWER SOURS EDWARDS,

                   Defendant.                    :

-----------------------------------------------------------------x

## PRELIMINARY STATEMENT

Dr. Natalie Mayflower Sours Edwards, "May," was brought up to respect and abide by the traditions of her American Indian background, specifically the Chickahominy Indian Tribe. As W. Frank Adams, Chief of the neighboring Upper Mattaponi Indian Tribe, notes in a letter he has written to the Court on May's behalf, "[h]er Grandmother, Mother and Father have always guided her in the ways of her forefathers, and she accepted those responsibilities as a personal duty." Letter of W. Frank Adams to the Court, attached hereto as Exhibit A. Pursuing as much education as possible was one of the values that was most deeply instilled in May by her family and tribe. So was providing public service. The Sours' credo, according to May's brother Nick: "You're here not just to help yourself. You're here to help other people excel."[1] May embraced both principles.

---

[1] I interviewed Nick Sours and his wife, Wendy, and May's parents to obtain information about Natalie Mayflower Sours Edwards' background. Nick, Wendy, Birdie and Woody have also written letters to the Court, which are attached hereto as Exhibits C and PP and RR respectively.

May went to college. She got a Master's Degree in Education. On October 3, 2007, she was awarded her doctorate. She was the first member of the Chickahominy Indian Tribe to earn a PhD. Determined to help the United States avoid another terrorist incident like the 9-11 attacks, which occurred while she was in graduate school, May began to work for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") after she was awarded her PhD. She excelled there, as she did at her subsequent jobs at the Central Intelligence Agency ("CIA"), the Office of the Director of National Intelligence ("ODNI"), and then at the Financial Crimes Enforcement Network ("FinCEN").

It was her work at FinCEN that brought May into conflict with the law – and her country – for the first time in her life. In 2016, she uncovered what she believed to be improper conduct at the Treasury Department. She blew the whistle and reported the conduct internally to her supervisor and then to the Treasury Department's Office of Inspector General ("Treasury IG"). Her security clearance was revoked without explanation – and then reinstated a day later. She filed a whistleblower complaint with the United States Office of Special Counsel ("OSC"). A long-planned work trip abroad was cancelled hours before she was scheduled to leave. She believed these actions constituted retaliation. May continued to object to what she perceived to be illegal and improper conduct.

Believing that the Treasury IG and OSC were not adequately investigating the issues she had raised, May brought her allegations to Congress. She identified her whistleblower status and provided information to and met with staff members of the House Permanent Select Committee on Intelligence ("HPSCI"), the House

Committee on Financial Services ("House Finance"), the Senate Committee on Finance ("Senate Finance"), the Senate Select Committee on Intelligence ("SSCI"), and the Senate Committee on Banking, Housing and Urban Affairs ("Senate Banking"). Staffers encouraged her to provide more information.

When Congress' attention to the issues May believed vitally affected the security of this country flagged, she began communicating with Jason Leopold, a reporter with the online publication BuzzFeed News. He told her that he shared her concern for national security. He assured her that the only way to revive Congressional interest was through media attention. He promised to – and did – introduce her to additional Congressional staffers. At his encouragement, she provided him with Suspicious Activity Reports ("SARs") and other internal Treasury Department documents. He wrote articles that disclosed that information. She was arrested. He was not.

What Dr. Edwards did was illegal. She was not authorized to disclose SARs. However, to determine what sentence is appropriate in this case it is vital for the Court to be aware of May Sours Edwards' background and history and to understand what motivated the actions that led to this prosecution. She got no benefit from providing information to the media. Indeed, she has lost her job, her home and her privacy as a result.

I submit this Sentencing Memorandum to detail these and other factors relevant for the Court's consideration under 18 U.S.C. §3553(a) in support of a request for a sentence of time served. While Dr. Edwards pled guilty to committing a serious crime, her extraordinary history of accomplishment, public service,

volunteerism and the unusual factors surrounding the offense conduct weigh in favor of this resolution.

**I.   DR. SOURS EDWARDS' HISTORY AND CHARACTERISTICS**

May Sours Edward's mother, Birdie Adkins Sours, was born in Virginia and raised in a traditional Chickahominy American Indian home. Almost everything her family consumed came from the lands. They farmed, had a garden and raised chickens, pigs, goats and dogs. When they needed sugar or flour – the two things they couldn't provide for themselves – they sold pine cones to the Virginia Department of Forestry to raise money to buy those items. Their home did not have electricity until Birdie was in high school. Plumbing wasn't installed until the late seventies.

While the family did not have much money, education was highly valued. America Indians were not granted United States citizenship until 1924, only three years before Birdie's mother, Sarah Mayflower Jefferson, was born. Letter of Sarah Mayflower Jefferson Adkins to the Court, attached hereto as Exhibit B.[2] Sarah was raised with the belief that to be a good citizen of the United States each American Indian had the obligation to educate himself or herself and other members of their tribes: They had to act "individually and collectively, one not an island adrift alone," but rather together "every step of the way" to make "themselves and each … better People – citizens of the United States of America." Exhibit B. Sarah instilled these values in her children to follow this path.

---

[2]Many states denied Native Americans the right to vote either directly by law or indirectly by imposing a prohibitive poll tax. The last state to grant Native Americans the right to vote did not do so until 1964.

Birdie and her siblings followed the path described by their parents. When Birdie grew up in Virginia, American Indian children attended their own Indian schools, which generally did not go past the seventh grade. To attend school beyond the primary grades, some American Indians in Virginia were given a one-way bus ticket by the Commonwealth to go to Bacone, Oklahoma. There Tribal Indians took the children in and gave them access to higher education – a high school diploma and maybe a year or two of college.

After finishing their education, the students paid their way back home, where they in turn provided educational opportunities for other tribal students. Birdie was fortunate. By the time she was ready for the 7th grade her tribe had a school that extended through high school. As Birdie was getting ready to graduate, the Chief and elders of the tribe visited her parents and then spoke with Birdie. They wanted her to go to a non-Indian college. They had obtained a scholarship for her to attend Lincoln Memorial University in Tennessee. Birdie already had decided to take a job as a flight attendant, but she knew what her duty was: Go to college. If she could accomplish that, it would open the door for future Chickahominy children. They would feel they could accomplish what she had.

The scholarship did not come close to covering all Birdie's expenses. She worked in the school's cafeteria for three meals daily and as a secretary for three to four hours a day. Still she took a full course load, joined the softball team and graduated with honors in three and a half years.

Woody Sours was in playing a softball game at the Tactical Air Command Air Guard Base in 1972 with his all-male team. Birdie was a member of the

opposing all-female team. He asked Birdie out. She had a date that night and declined. Woody asked again. Birdie agreed. The two fell in love and married once Birdie had graduated from college.

When Birdie and Woody got married on April 19, 1973, the United States was at war with Vietnam. Woody was one of two children. His father was a tugboat captain, and when Woody was five years old, he started working on the river helping his uncle harvest seafood. Woody had had enough of the water. After graduating from high school, he enlisted in the Air Force. He remained in the Service until he retired as a Senior Master Sergeant in 1993. When May was growing up, Woody was deployed. He often spent months at a time away from the family. Birdie took over the parental duties, while working as a secretary at an insurance company and then a pharmaceutical company. Later she taught at the Chickahominy Indian School and ultimately in the Henrico County School District. Woody and Birdie were not wealthy, but with both of them working, they provided for their children and helped others.

Birdie and Woody wanted a family. They got pregnant easily enough but could not carry to term. Birdie suffered four miscarriages. In 1975, they again became pregnant. This time Birdie felt very ill and extremely uncomfortable. An x-ray – the standard diagnostic tool used during pregnancies in those days – revealed the surprising news that she was pregnant with twins. On December 21, 1975, Birdie gave birth to Nakoma Dawn and Nick Chippewa. Only eighteen months later, Natalie Mayflower Sours was born.

Woody is not American Indian, but he embraced Birdie's culture and way of life. He and Birdie brought their children up to know and respect the traditions of the Chickahominy Indian People. The children attended Indian school at the Tribal Center on Saturdays. They learned to the true history of their ancestors and were taught the meaning of and how to create the traditional intricately beaded clothing - regalia. They studied the oral history and customs of the Chickahominy people and other American Indian tribes. As Birdie describes it, the children learned the heritage of their people, everything that had been passed down from generation to generation: We are no better or less than anyone else or any other lifeform on Mother Earth. Anything that our Creator has given life to here on earth, we share responsibility for.

Nick and Nakoma had that twin bond, but May was competitive. She wanted to do everything her older siblings did – but better. Nick describes May as his "'little" big sister. While she was the youngest, she "carried herself as if she was the older one." Letter of Nick Sours to the Court, attached hereto as Exhibit C. Nakoma served as Junior Miss Chickahominy. Two years later May did. In that role May accompanied the tribe's dance group and performed before different civic organizations. The girls' job was to explain the beliefs of the Chickahominy people to the members of the audience. The money made was donated to the Tribal Education Fund. Nakoma was a competitive softball player. May joined the team also.

While May wanted to be the equal or better of her siblings, she was 18 months younger. Nakoma and Nick were two grades ahead of her. When May was

a junior in high school, the older kids took off for college. When Nakoma was in her second year at George Mason University and May was a senior year in high school, Nakoma decided to surprise the family by coming back to see one of May's softball games. Nakoma Dawn was killed in a fatal car accident on the drive home.

To say the family was devastated does not do justice to their feelings. Birdie describes Woody's inability to function. He already suffered from Post-Traumatic Stress Disorder, a legacy from his years of service. Nakoma's death nearly destroyed him. Nick was the "inner twin," less gregarious than Nakoma. He "totally fell apart." Birdie arranged for him to reduce his class load to one course so he could technically remain enrolled in college and spend more time with the family.

May was angry. According to Birdie, May "wanted to punch everyone's lights out." Instead, she sublimated her anger into drive. To heal the family's wounds and her own, she became the perfect daughter.

May won a partial softball scholarship to North Carolina Wesleyan College. She double majored in Medical Studies and Biology and earned excellent grades. Birdie Sours, had been the first member of the Chickahominy Tribe to get a college degree at a University not run by Native Indians. May became the first member of her tribe to receive a PhD. It was not easy. She worked full-time teaching science at Lloyd C. Bird High School while she pursued her Master Degree at Virginia Commonwealth University ("VCU"). A friend of May's at VCU, Dr. Timothy Fuhrer, was working at Byrd while he, too, was pursuing an advanced degree, and a last-minute teaching position opened up. He recommended May for the job. She was

given an interview and was offered the position the next day, the week before

Labor Day.

The Chair of the Science Department, Kathleen Pendleton, was a bit

nervous about the novice teacher she had just hired with only days to prepare for

the school year. Her concerns were quickly put to rest:

> That weekend [May's] parent and fiancé helped move her materials
> into the classroom and by the time the students arrived, bulletin
> boards were up, desks organized, syllabi and lesson plans were
> written, and she was ready to welcome her students.

Letter of Kathleen Pendleton to the Court, attached hereto as Exhibit D.

May felt an affinity for the children others found difficult to reach. Tim Fuhrer

describes May's five years at Bird in a letter he has written to the Court:

> She volunteered to teach the class with the most troubled students
> because they needed the most attention, and she knew she would
> love them enough to give it. She helped students who had never
> found success in school before find it in her biology and physics
> classes, and on the odd occasion that she couldn't reach a student,
> she mourned.

Letter of Dr. Timothy Fuhrer to the Court, attached hereto as Exhibit E. Kathleen

Pendleton agrees. May "didn't have the most motivated students," but she "was

able to reach them and challenge them to meet high expectations." Exhibit D. May

paid her students the great compliment of respecting them. She believed they

could succeed and insisted that they do so. Kathleen Pendleton provides one

example: "We always knew when her students were giving oral reports as they

would come to school dressed in suits/dresses and exhibiting confidence not

usually displayed as they walked through the halls." Exhibit D.

During periodic lunch-time meetings of the science staff, teachers shared difficult problems they were encountering and sought each other's advice. Tim Fuhrer recalls that May's "replies in those times always brought us back to thinking about what would be best for our students, how we could teach them best, not just our course content, but also how we could best teach them to be productive, loving, gracious members of their society and families." Exhibit E. These were exactly the attributes May had been taught were important by her mother, father, grandparents and other members of her tribe.

Tim Fuhrer and Kathleen Pendleton agree that May grew into an amazing, well-respected teacher – and coach of the girls' softball and soccer team. Dr. Fuhrer believes that there "are hundreds of Lloyd C. Bird High School alumni who are better people and have better lives because of their time with our [May]." Exhibit E.

On August 3, 2002, while she was teaching at Bird, May married Dave Edwards, a man she met as the result of a set-up. After having completed five years of service as a Chemical Warfare Specialist in the United States Army, Dave was working as an officer on the Richmond City Police Department. The job seemed almost tame compared to his military assignment to a med evac unit, extracting soldiers from various locations and testing them for exposure to chemical weapons.[3]

---

[3]Dave joined the service in 1990, just two years after Sadam Hussein's March 16, 1988, use of mustard gas and other chemical agents on the Kurdish people of Halabja, Iraq.

When Dave and May met, it was love-at-first sight, but only for Dave. May was more cautious. Dave was persistent. He courted her family as well as May, and when he sensed she was ready to say yes to a proposal, he followed the Chickahominy custom of seeking permission from her parents and then the wife of the Chief of the Tribe. May and Dave were married first in a traditional Native American Indian ceremony at dawn in front of family, friends and members of the Chickahominy Tribe. Letter of Dave Edwards, Jr, attached hereto as Exhibit F. Sarah Adkins, Birdie Sours made the bride and groom's regalia. May had been brought up with the spiritual beliefs of America's Indian Nation, which Sarah Adkins describes as Creator (God), Great Spirit (Jesus) Individual Spirit (Holy Comforter) and One's Earthly Clothing (human body). May and Dave's American Indian wedding ceremony incorporated those elements. May had also been raised as a Christian, and a wedding at the Samaria Indian Baptist Church was celebrated later the same day.

Dave was "completely in awe" of his new wife's "work ethic" and "a little embarrassed" that he had not completed his college education. Although Dave was working full time as an officer with the Richmond Police Department, May "inspired  [him] to go back and finish his degree." Exhibit F. While Dave was back in college and May was working on her doctorate, May became pregnant. Before their marriage, May had disclosed to Dave that she had medical issues that made it unlikely that she would be able to have a child. Dave assured May that he was not concerned, and God would "have the final decision." When they found out May was pregnant, the two were elated. Trouble followed. May's physician told the

couple that because of May's medical problems the pregnancy was very high risk and there was a significant possibility that they would lose the child. Dave was "an emotional wreck, scared to death[.]" Exhibit F. May was calm and resolute. After several months of enforced bed rest, May delivered a healthy baby girl on April 4, 2005: S----- Nakoma E------.

May and Dave continued their studies while working, aided by a rotating group of relatives who had keys to the house so they could come by and help. They did, constantly, making it possible for May and Dave to finish their educations.

The September 11 attacks also took place during May's studies. The events of that day made it clear to her that her form of public service would involve protecting her country. After consulting with her academic advisor and ruling out a career in the military as impractical given her roles as mother and spouse, May decided she would seek employment with one of the federal security agencies. See letter of Dr. Gary Sarkozi, attached hereto as Exhibit G. May wrote her dissertation on "Perceptions of Core Leadership Competencies Among Senior Level Officials within the Department of Homeland Security" ("Homeland Security"). Her doctoral research had both quantitative and qualitative components. She read everything that had been published about decision-making in Homeland Security. She also interviewed top-level officials at the Department, another federal agency and members of the military to gain insight into how they analyzed the issues they faced. May's work was excellent. According to Dr. Sarkozi, May "became respected by her classmates and by the faculty. She was

always willing to help others and encourage others to strive to be their best." She was inducted into Phi Kappa Phi, "the nation's oldest and most selective all-discipline honor society membership[.]" Exhibit G.

The newly minted "Dr. Edwards" had a broad range of employment choices after she defended her dissertation. She decided to accept a job offer from ATF as a Learning Technologies Training Specialist in the Office of Training and Professional Development ("TPD").[4] When May worked at ATF, as now, the Bureau provided training not only for its own employees but also for thousands of state, local and industry personnel, as well as foreign law enforcement. While at ATF, May wrote a proposal detailing how the agency could use software that would permit new agents to take some courses live from their work desktops instead of flying trainers to field offices to give the course or flying trainees to the Federal Law Enforcement Training Center in Georgia. The project was funded, and learnATF Live was born.

May spent the next several years providing "advice to TPD management and personnel and Bureau program officers on the use of learnATF Live for delivering or recording virtual classroom training." ATF Annual Performance Appraisal 01-OCT-2008 TO 3—SEP-2009, attached hereto as Exhibit H. May's 2008 to 2009 Annual Performance Appraisal describes her duties for that period. She "served as the primary administrator of the Bureau's classroom tool, learnATF Live." *Id*. at 5.  She helped "develop, coordinate and deliver a wide range of virtual

---

[4]This division of ATF is now called the Office of Human Resources and Professional Development.

session in FY09, providing training to more than 1,600 ATF employees." *Id*. She "worked closely with subject matter experts (SMEs) from Chief Counsel Field Operations and Materials Management to develop content for each session." *Id*. May's supervisor was "pessimistic about the utility of the virtual training" but found that under May's management, the tool was "very convenient, user friendly, and worked out quite well." *Id*. This was because of May's effort: developing content for the programs, troubleshooting technical issues and teaching ATF employees how to use the software.

During the 2008-2009 period, May's performance was deemed "Outstanding" on three of the four Critical Elements: Learning System Consulting and Support, Project Planning/Management and Problem Solving/Decision Making.  On the fourth element - Oral and Written Communication - she received a score of Exceeded.[5] Her overall score was Outstanding. Her supervisor described May's work as follows:

> Dr. May Edwards is a true asset to LTB [Learning Technology Branch]. Despite all of the problems that occurred this year with the Centra platform, she has helped continue to grow the success of learnATF Live. She has quickly adapted to changing conditions thereby ensuring that sessions occurred as planned and demonstrated strong technical and problem-solving skills under pressure when unexpected difficulties threatened to force the cancellation of events. Her dedication and hard work is truly appreciated.

---

[5]Dr. Edwards advises that she received similar evaluations for her other years of employment with ATF.

Exhibit H at 18. The second-level reviewer comments of May's work were shorter, but similarly laudatory: "Dr. Edwards, you are a true asset to the Bureau's training efforts. Thank you for the outstanding work this appraisal period." *Id.* at 16.

May was happy at ATF. The work was challenging and the agency also was a welcoming place. It was family oriented, an important fact to the mother of a five-year old. May's husband Dave was then working as an officer assigned to the Special Operations Division. While his schedule fluctuated, he was most often able to be home during the days with S----- while May worked in Washington, D.C. Six months of the year, Dave was on call for emergencies. When he got called in unexpectedly, Dave dropped S----- at Birdie and Woody's home for an overnight. They loved it, and so did S-----. It was a demanding schedule for both May and Dave, but they were making it work.

Nevertheless, after spending a little more than three years at ATF, May was ready for a new challenge. In March of 2010, she took a position at the Central Intelligence Agency ("CIA.") She was detailed to the Office of the Director of National Intelligence ("ODNI"), where she began as a Community Management Officer. Building on her work at ATF, she helped ODNI and other national security agencies implement the use of the Blackboard Learning Content Management System.[6] In her performance evaluation for her first year, May's supervisor describes what May accomplished as follows:

---

[6]Blackboard is a learning course-management system designed to allow students and faculty to participate and collaborate in classes delivered online and to use online materials and activities to complement face-to-face teaching. Faculty and student material can be stored in the management system and accessed from virtually anywhere a network is accessible, which enhances productivity.

Dr. Edwards single-handedly launched the Blackboard Learning Content Management System for NIU [National Intelligence University] and the IC [Intelligence Community] (NIU Blackboard Affiliate Program) in her first six months as a new member of the ODNI staff. This required strong collaboration with MSC's engineers, Blackboard technical support, and the IC components to make this an IC-wide enterprise success story…. It is rare to find an employee who, in their first six months, creates such Community-wide impact. Natalie is now working across the IC to launch this capacity on JWICS and has attracted a strong interagency working group to support this effort. Members include CIA, NSA [National Security Agency], NGA, NRO [National Reconnaissance Office], DOE [Department of Energy] and DDS [Defense Digital Service] to enable this project to quick completion. In early 2010, Dr. Edwards is now a recognized change-agent for delivering an enterprise solution to the E&T operations of the Community. With a rare combination of a technical and educational background, the results of her work will have even strong impact in the coming year.

Exhibit I at 5.

May did "have an even stronger impact" in the coming years. After recovering from surgery on her back, neck and later salivary gland during 2011 and early 2012, May assumed the responsibility for implementing the Human Capital Enterprise Services ("HCES"). The goal of the project was to create an integrated, collaborative system for sharing service capabilities. For example, if someone in the National Security Administration ("NSA") needed a translator who spoke Farsi, the NSA employee could access the database and see what other agency – the Intelligence Branch of the Department of Energy ("DOE") for example – had someone who could provide that service. May's role was to write the operational concepts and the budget justification. She also was tasked with having each agency Chief Counsel's Office agree on the Memoranda of Understanding

16

("MOU") and getting each Human Capital Officer to the sign the MOU that permitted the system to operate. She was able to achieve what would seem to have been impossible: to get seventeen intelligence agencies, the Under Secretary of Defense and the Department of Defense to agree to share information through a centralized system. May was promoted to Deputy Chief of Information System on December 2, 2012.[7]

In a note she sent to May on January 14, 2013, the Chief Human Capital Officer at ODNI, who was an Assistant Director of National Intelligence, thanked May for her work on the HCES project. May's efforts had a "considerable impact on the advancement of this important initiative." Letter from ODNI Chief Human Capital Officer dated May 14, 2013, attached hereto as Exhibit J. May had met one of the personal goals she had set for herself following the 911 attacks: Get the intelligence agencies to share information.

On her employee appraisal for October 1, 2012, through October 1, 2013, May was given a rating of outstanding. Employee Performance Rating Start Date 10/01/2012, End Date 10/1/2013, attached hereto as Exhibit K, at 5. She was characterized as an "exceptional staff officer who works quickly and efficiently with leadership, peers and subordinate." *Id*. She was "a talented officer whose drive and energy" were valued. She was able to "quickly review complex issues and distill the most critical issues to enable senior leadership and non-technical

---

[7]While at ODNI, May held the following positions before her promotion to Deputy Chief of Information Systems: Community Management Officer, Senior level from March 29, 2010, through September 30, 2012. On October 1, 2012, assumed the position IT Project Manager – Supervisory Expert.

colleagues to clearly understand the impact and nature of the issues, enabling leadership to make more informed and timely decisions." May was "the consummate staff officer: flexible, quick and through." *Id.*

In October of 2014, May was recruited to work at FinCEN by someone she had worked with previously. The CIA is an excepted service – not subject to the policies, legislation, and pay requirements of the U.S. Office of Personnel Management ("OPM"). Additionally, May had already applied for and been offered a Senior National Intelligence Service (SNIS) position, equivalent to Senior Executive Service (SES) level in the civil service. May had learned that the location of her new assignment would cut her commute in half. The FinCEN job would have to be something extremely worthwhile to persuade her to say no to the SNIS job.

 May's FinCEN contact made a tempting offer: May could telework a significant percentage of the time. May's daughter was eleven by then. Dave had been shouldering more than his share of the childrearing duties, and S----- would be needing more of both of May and Dave's energy as she approached her teen years.[8] There was an equally enticing aspect of a job at FinCEN. An IC employee is not permitted to use personal electronic devices at the workplace, making communication with family during the day difficult. Important family calls would go to voicemail to be returned later. To be able to talk to her husband and daughter at any time was the deciding factor for May. When she took the job at FinCEN, May promised S----- to never again miss a call from her. During her time at FinCEN,

---

[8]The "maxiflex schedule" would also enable enabling her to have flexibility to address health issues. *See* discussion of Dr. Edwards' medical conditions, *infra* at  56.

May always took S-----'s call. If May was in a meeting, she would take S-----'s call. If May was on another phone call, she would take S-----'s call. In fact, May kept her promise and did not miss a call until she was arrested on October 17, 2018.

The nature of the work May would be doing at FinCEN also was a significant draw. FinCEN, like many federal agencies, had never established a formal career structure. They did not have job descriptions for the positions, a career ladder or training for analysts. This was a project May looked forward to taking on. She drafted position descriptions for FinCEN's Intelligence Division. Established in her career by then, May was interested in helping younger employees advance. She created and disseminated career development steps, which served as a roadmap for employees to advance through the General Schedule ("GS") to higher grades of pay and greater responsibility as Intelligence Research Specialists.

In her first Employee Performance Appraisal at FinCEN May received an overall rating of "Outstanding". She was found to be outstanding in Communication (provides quality and effective written and oral communication), outstanding in Customer Service (provides professional and responsive service within mutually agreed upon time frames) and outstanding in Leadership and Human Capital Management. EMPLOYEE PERFORMANCE APPRAISAL FORM for Rating Period 1/22/2015 through 9/30/2015, attached hereto as Exhibit L.

By the time her second evaluation at FinCEN was drafted, May had finished creating the position descriptions and was recruiting employees. Her duties also included analyzing incoming requests for research support submitted to FinCEN by domestic law enforcement agencies. She screened the requests to be certain

they met FinCEN's requirements. She conducted analyses herself. May also had significant administrative duties, including developing the Annual Operating Plan and Staffing, Procurement and Budget plans for FinCEN. She provided internal training. Working with the Associate Director, she "developed, recommended, and implemented administrative policy affecting more than 100 civilian contractors and employees." EMPLOYEE PERFORMANCE APPRAISAL FORM for Rating Period 10/1/2015 through 9/30/2016, attached hereto as Exhibit M.

May was again ranked as outstanding at her position. She received ratings of outstanding on Communication, Customer Service, Teamwork, Technical Competency, Leadership and Human Capital Management, Business Acumen/Enterprise Program Mgt and Integration and Collaboration. Exhibit M at 2-5. In the narrative section of the evaluation, May's supervisor described May as a "keen strategic thinker" who "fostered team commitment, spirit, pride and trust. She facilitated cooperation and motivated team members to accomplish group goals."

May's professional life was rewarding but demanding. The work was intellectually challenging, and May knew the sacrifices she was making were worth it: She was helping to keep her country safe, the goal she had set for herself back in graduate school. Nevertheless, May and her family paid a price for the long hours.

May and Dave decided they wanted to raise their daughter in a rural environment, similar to the one that they both had enjoyed as children. They settled in town close to family on tribal land. May's job was 108 miles away from

Richmond, where Dave worked. May bore the brunt of the commuting, which was time consuming. The hours away from her daughter weighed on May. As May's brother Nick notes in his letter to the Court, "[w]orking so far away from home was a huge sacrifice for [May], but she believed she was making a difference in shaping a better future for all of us." Letter of Nick Sours, Exhibit C. A colleague at the time, Clifford Maxfield, also provides insight on this conflict in a letter he has drafted to the Court:

> My name is Clifford E. Maxfield, Jr.  I am currently an honorable retired United States Military Police Officer and I have also retired from the United States Federal Government.  My last military duty position as the Command Sergeant Major allowed me to have the opportunity to serve in Washington, DC for 15 years charged with the responsibility for the protection of the White House, Capitol Hill and the City of Washington, DC. During this time, I had access to levels of classification beyond military duties as well as setting up security measures for Presidential Inaugurations and the complete security needs of Washington, DC.  My unit's first responsibility was to be the first line of defense for all federal property and the City.
>
> I met Natalie (May) in 2004 while working with the Justice Department in Washington, DC. She first gained my attention as a very committed person to her job, family and her heritage as a Native American.  Each day as she would travel from Richmond, Virginia by train to Washington, DC, work a full schedule and never complain convinced me she a very persistent in making sure she was on time and very detailed in research and providing only factual information for upper level briefings.
>
> ***
>
> Throughout our time working together, conversations about her daughter became everyday topics.  Knowing her work schedule of departing Richmond, Virginia prior to her daughter (S-----) awaking and returning home just in time to tuck her in nightly weighed heavily on her as a mother.  Many days as she shared the weekend quality time she had with her daughter, I could sense the hurt and pain in her voice as she would explain the lost time with her daughter during her early years.

Letter of Clifford E. Maxwell, Jr. to the Court, attached hereto as Exhibit N.

May also traveled for work frequently at times during her career, which posed an additional burden, as S----- explains:

> I remember when I was 9-10 years old, and my mother would go overseas for weeks twice a month. Every time she would stand at the end of TSA and wave goodbye to me. That goodbye was the hardest thing to experience as a child. Another special moment in my life with my mother was when she would write me postcards from every country she ever visited.

Letter of S----- Edwards to the Court, attached hereto as Exhibit O. May sought ways to make this easier on her daughter, as a friend recounts in a letter to the Court:  May "would ask me to look out for her girl when she had to go out of town for work. I always did with pleasure. I knew [May] was doing her patriotic duty and loved her job, but it killed her leaving her daughter." Letter of Stephanie Wright to the Court, attached hereto as Exhibit P.

May's brother, Nick, recounts how May sought to easy S-----'s anxiety:

> May would travel to DC for work, and S----- would plead with her to stay. May would get down on her level and calmly explain that Mommy has a special job and was helping to make the world safer for her and her friends.

Exhibit C. Difficult as it was, May always pushed to make it home for bedtime.

In spite of the work pressure they faced, May and Dave were determined that S----- would be given the same degree of attention, the same type of childhood, that they had had. May made sure S----- learned about her American Indian heritage. May and S----- danced in pow wows together. Letter of Ann Moore, attached hereto as Exhibit Q. S-----, like her great grandmother, grandmother and mother, learned to make traditional America Indian regalia.

Many of the people who have written letters to the Court on May's behalf have commented on her role as a parent. A retired 30-year member of the Intelligence Community who is now an ordained Baptist Minister notes that "May's face would always light up with a smile when you talked about her daughter." Letter of Reverend Jeffrey Gaines to the Court, attached hereto as Exhibit R. Mike Lawson, a friend of six years, describes the way May interacts with her daughter in his letter to the Court:

> Through my six years of knowing May she has been a shining example of a mother to her daughter. Actively participating with her daughter in sports and activities. Showing outstanding patience, love and compassion that a child so desperately desires and needs at a young age. Witnessing this has helped me as a father myself, to aspire to have all of these same attributes with my children.

Letter of Michael Lawson to the Court, attached hereto as Exhibit S. Bridget Cook, a friend of May since high school, wants the Court to know that she has "witnessed the love [May] gives to her daughter who desperately as a teenage girl needs her mother to be with her and guide her like she was guided by who mother who helped her be a successful adult." Letter of Bridge S. Cook to the Court, attached hereat as Exhibit T.

Sixteen-year-old B------- B------, a close friend of S-----, provides an inside view of the Edwards' house. May was not Mrs. Edwards to B-----, she was a "second Mom" – Mamma May. Mama May was "the most honest, outgoing, loving mother" who provided stability in this time of "COVID, riots, and not even being able to go to school[.]" Letter of B------- B------ to the Court, attached hereto as Exhibit U.

When S----- turned 13, the Edwards finally were in a position to fulfill a long-held dream: They bought S----- a horse. S----- named her Diva. Horseback riding was a part of May's American Indian tradition, and May had been a rider since she was young. The barn culture brought new friends for May and S-----, and new opportunities for May to pass on important lessons. Margaret Buchan, the mother of one of the other girls who kept her horse at the same barn describes May's parenting style:

> Through the horses, she has taught our daughters the importance of perseverance, kindness, trust and respect. When her daughter's horse, Diva, started having behavioral issues, May gave her daughter the guidance and confidence to persevere. Not through force or fear, but through gaining the horse's trust and respect through groundwork and positive reinforcement.

Letter of Margaret Buchan to the Court, attached hereto as Exhibit V. Margaret notes that May became a role model to the girls in the barn as someone who "earned respect and worked hard to do her best while at the same time balanced a family and community." *Id*. Another member of the barn family, Charlotte Strom, also was struck by the way May helped the girls in the barn develop: "In this difficult age of parenting, she is always there to show the girls how to traverse adversity, stay strong and always care for one another." Letter of Charlotte Strom, attached hereto as Exhibit W.

After May's arrest, she and Dave no longer had the money to board Diva. The family had to sell the beloved horse. S-----, perhaps sensing the precarious situation May's prosecution had created for the family financially and emotionally, sought to protect her mother and father. She minimized what this loss meant to

her. Dave and May couldn't. They were haunted by the sense that they had failed to shield their daughter from this additional blow.

May is not just a good mother and wife. She is a supportive and caring friend and an exemplary member of her community. She follows the rule that she had been taught as a child: Help everyone excel. Improve your community not just your own life. Amy Moore, a friend of May's for over thirty years describes how May put these principles into action when she volunteered to be President of the PTA when S----- was in kindergarten:

> At that time, our county had furnished a few of the classrooms with promethean boards, a high-tech, crazy-expensive classroom learning aid. [May's] goal as PTA president was to purchase as many promethean boards as possible so every student at the school would have the same exposure, the same possibilities as those with access to the technology. I personally watched her work tirelessly to raise the money for those purchases.

Letter of Amy Moore to the Court, attached hereto as Exhibit X.

May arranged sleepovers, not only for S-----'s benefit but to give other children's parents some much-needed help. Charlotte Strom provides one example in her letter:

> My daughter has a chronic illness that limits her daily activities, but Dr. Edwards has always been there to lend a helping hand when needed. She has gone beyond the average daughter's friends' mom role and learned how to take care of my daughter so S----- and Emily could have sleepover's as well as give me much needed time off from the everyday chaos of my daughter's disease. To me this speaks volumes about the character of May, she is willing to give of herself, time and energy to care for others but she does it out of pure love and devotion for her daughter.

Exhibit X. May understood the anxieties parents face, and she sought to help alleviate them:

> Our girls were very close and as children do started making plans for sleepover. We exchanged numbers to get to know one another before. Her house was the first time my oldest daughter stayed the night out with a friend. I remember feeling nervous as all mothers do when it's the first time you are leaving your child in someone else's care. When my daughter and I arrived, I will never forget how May made us feel. She completely understood and made us feel so welcomed answering questions that I did not every have to ask; as great mothers do. She let me stay to make sure my daughter was comfortable and took me on a tour of her house. May sent pictures through the night of fund the girls were having and even called to say prayers before bed. It was the next day when my daughter called and asked to stay the night again, was when I knew she was an amazing mother.

Letter of Vanessa De Mers to the Court attached hereto as Exhibit Y. Another friend, Casey Burmeister, also benefitted from May's willingness to support another parent in need:

> One example of the many times May has helped me out is when I needed her to watch the kids and it was extremely short notice. She came right over with no hesitation. She followed the medical allergy instruction for my kids who both have severe allergies to food and other outdoor allergies; and reported to me on a consistent schedule how the kids were doing advising that there were no medical concerns.

Letter of Casey Burmeister to the Court, attached hereto as Exhibit Z.

In the more than fifty letters that have been written to the Court on May Sours Edwards' behalf this consistent theme emerges. She always helped others. Clifford Maxwell, a former colleague, describes how May helped him "during the darkest period" of his life:

> I was assigned to a Special Operations Team (Special Police Transition Team) during the Iraqi conflict. Our mission as a nine-member search and destroy team required us to engage hostile forces outside of the comforts of an encampment daily…When I returned to my job from my tour of duty, her caring and understanding about my mental state had a significant impact on my recovery and acceptance within the work place. She identified the importance of

listening and the sensitivity of being there for me as I battled through Post-traumatic Stress Syndrome (PTSD). She reinforced the professional and home therapy I was receiving and made sure I slowly transitioned with few complications.

Exhibit N.

May's niece gives a vivid example of how May continued to put others first,

even after her arrest on this case, when May could very understandably have been

focusing solely on her own needs:

Because I am a junior at Liberty University, my schedule is always packed. Between school, family, and friends, I was mentally exhausted. Without question, May welcomed me into her home, and was adamant on helping me in any way she could. I am usually the type of person who talks too much, so May could tell I was stressed when I was at a loss for words. I was ready to break down and cry when May took it into her own hands and began helping me with my biggest stress-holder; schoolwork. She stayed up during all hours of the night to help me complete a speech that I had been stuck on for days. She had court papers all over the bed, and before I knew it, she had cleared everything off and focused on what I needed. I did not realize at the time but May dropped everything to dedicate her night to my speech. She had stopped all preparation for her case, stopped receiving phone calls, and committed her time to me. Something as simple as helping me prepare, truly meant the world to me, because I knew that she had other pressing issues that needed her attention. This act of kindness showed me how dedicated she was to see me succeed and how generous she is to others. She sacrificed time and effort that she could have been using for personal gain, all just to help a college student get a good grade.

Letter of Danielle Hamilton, attached hereto as Exhibit AA.

When a cousin started college as a single mother with three children, May

was there to help:

Through the years I had a desire to go to college. As a single mom I wanted to show my children that any dream was possible. As I walked in to my very first college class, having no clue what adventure I was in for, May was right by my side. Many English papers and research papers she would get to proofread, with a cry of "Am I doing this right" added in from me. She would do a tweak

27

here and there, add lots of commas, then send it back with a call or text telling me I was doing awesome. May was always there, sometimes quietly in the background, answering my tearful calls when it got hard. Once I asked her, in tears, "Is it worth it? Finishing college?" She quickly assured me it was so worth it to get to the other side. And I did get a degree in Bioinformatics from VCU. I truly know that if she was not by my side, I am not sure how that adventure would have ended. She is truly my "Superman."

Letter of Debbie Hamill to the Court, attached hereto as Exhibit BB.

May dropped everything, including a beloved Cowboys game, to help

Dave's nephew, Tyler, with his college application:

I reached out to Aunt May and told her that I was hoping to apply to college at her alma mater Virginia Commonwealth University, and asked her if she would be able to review my entry essay. Aunt May responded immediately and told me to bring it by the house. Anyone who knows Aunt May knows how much the Dallas Cowboys mean to her, and that when they are playing, she is not to be disturbed. It was much to my surprise that when she told me to come over, that the Cowboys were playing, but that didn't matter to Aunt May. She sat down with me, and acted as if the game wasn't even on. She took time out of her weekend, yet again, to assist me with something that meant so much to me.

Letter of Tyler Robertson to the Court, attached hereto as Exhibit CC.

When Tyler's family needed financial help, May and Dave jumped in:

Her kindness toward all people and unfailing love for her family is evidence in all that she does. We had an unfortunate job loss due to the economy in 2010. May and her family were the first to arrive with two large coolers filled with meet and other food.

Letter of Mama Robertson to the Court, attached hereto as Exhibit DD.

May has lived her life this way from a very young age. A high school friend,

Dianna Wills, who is now a pediatric oncology nurse, describes how May's support

and encouragement got her through a difficult junior year in high school. In her

letter to the Court, Ms. Willis provides a telling example of the type of person May

is by noting that she is "the friend my parents still ask about whenever I see them because she was such a positive influence on me growing up." Letter of Dianna Wills to the Court, attached hereto as Exhibit EE. Another high school friend, Jeff Parrish, attributes May with making "getting through the most difficult times in teen life enjoyable with her exuberance and cheeriness[.]" With May's help "Mrs. Shirley's science class was a breeze." Letter of Jeff Parrish to the Court, attached hereto as Exhibit FF.

The law enforcement community of Richmond also greatly benefitted from May's generosity of spirit. The spouse of a member of a police officer is in a unique position. The fear that your loved one will not come home is always lingering in the back of the your mind, threatening to intrude. But you do them no favor by expressing that fear too frequently or too vividly. Dave Edwards ably described the pressure that getting this balance right placed on May, something he became aware of only after he retired:

> Along with being a courageous mother and wife, May had to also handle the task of being married to a police office. The amount of lonely nights and nervous energy that I now am being told since I retired is gut wrenching. May never let me see how scared she was with my profession. She hid the concern for over 20 years….May always said the best noise she ever heard for the last 20 years was the sound of Velcro because she knew I was home, safe and was taking off my vest and uniform.

Exhibit F.

May had reason to worry. Dave was injured repeatedly on the job. A drug-fueled suspect punched him, rendering him unconscious, leading to a concussion. An emotionally disturbed woman climbed to the roof of her home and threatened to jump off. Dave was able to reach her through the attic and grab her back into

the home. She fell on top of him, sending both of them crashing through the attic floor to the level below. Dave still receives monthly cortisone injections in his knee as a result of the injury he suffered. During his tours in vice, with various State Police task forces, in street crimes, and many other assignments, he was attacked physically and verbally. He was shot at several times. Dave was lucky, though, because after every minor injury and stint in the hospital emergency room for more serious ones, he came home.

Not all officers did. When the worst happened, May was there to support those who survived and help them mourn, as several members of the Richmond law enforcement community have noted in letters to the Court. Demetrium Melton, who worked with Dave Edwards on the Richmond Police Department, describes a particular incident in which May played a key role in helping Dave's fellow officers deal with horrible tragedy:

> Towards our Law Enforcement family, May was that person on whom I could always depend, whether for a shoulder to lean on or for a listening ear. Back during the mid-2000s, we lost a good friend/brother/coworker due to an accident. That was a huge hit to us within our community of Law Enforcement. May was there for us all from the beginning to end with support.

Letter of Demetrium Melton to the Court, attached hereto as Exhibit GG. Another member of the Richmond Police Department also discusses that tragic death and how May helped the community cope with it in his letter to the Court:

> When we were told about the accident the feeling of disbelief was overwhelming. Her husband was devastated, she was devastated, but May being the person she is did not let that cripple her. The strength and love that she showed to her husband, their daughter and myself was beyond measure.

Letter of Michael Scott Motley to the Court, attached hereto as Exhibit HH.

Kevin Wright, who also served on the Richmond Police Department, writes about another incident in which a fellow officer was shot and killed in the line of duty.

> My earliest memories of her kindness was while attending funeral services in 2003 of a friend and Police Academy classmate, Doug Wendel. Doug was killed in the line of duty by a gunman, and we were all devastated. Alone with services here in Richmond, VA, there was a service in Florida for another contingency of Doug's family and both services were incredibly difficult. We were all honored to have May present for each service as she was comforting and supportive for all of us.

Letter of Kevin Wright to the Court, attached hereto as Exhibit II.

May also has spent considerable time and energy, even when work pressures were intense, to try to advance other members of the Chickahominy Indian Tribe and other American Indians. First, May made it a personal mission to try to educate those around her about the American Indian culture. Several friends and colleagues comment on this in their letters to the Court.

> I was further impressed with her loyalty to her family and her tribal beliefs. I am originally from Central Virginia and as a student in school we studied Virginia and Eastern United States history, but May provided me with a history lesson outside of the books on the heritage and culture of her Native tribe located about one hour from my family's farms. The lesson she taught me cause me and those I have told to have a significant serious approach and local understanding of the importance of an untold part of American history from living individuals in her tribe.

Curtis Maxwell, Exhibit N.

> May is a member of Chickahominy Indian Tribe – her Indian heritage is part of her belief in working hard and serving her fellowman. May continually works with the Chickahominy tribe assisting with the tribe's needs today

Letter of Jane Carter to the Court, attached hereto as Exhibit JJ.

> I have danced alongside of May at Native American Indian Pow Wows including that which is held by her tribe the Chickahominy. I have seen her interact with children helping them to understand our culture and teaching them the proper way to respect their elders, the dance circle, and the culture. I have also seen her teaching them the correct way to dance and how to make their American Indian dance regalia, (the outfits worn while dancing).

Letter of R. Keith Smith to the Court, attached hereto as Exhibit KK.

> As I'm sure you are aware, if not you are now, May is Native American and very involved in her tribe and the continuing education to ensure that their heritage will not be forgotten. If you are considered family by May, this includes the rituals and belies that she is continuing to teach others. To May, John [a Richmond Police Officer who died in an accident], was family, and as her family, in her eyes he deserved proper passage to his next life. At one of the memorial services for John she performed this dance/ritual for him. It was her way of giving back to him. This has stayed with me because I know how sacred those dances and rituals are and for her to do that for him out of pure love, respect and for the mere fact that she felt it was the right thing to do moved me.

Letter of Michael Scott Motley, Exhibit HH. James Taylor, a long-term family friend notes that May "has been vital in keeping the history and fighting for the rights of her tribe." Letter of James Taylor to the Court, attached hereto as Exhibit LL.

May also worked directly with her tribe and others to improve the quality of life for American Indians. For the past year May has been a key member of an initiative to establish a tribal education agency for newly federally recognized tribes in Virginia to help serve the educational needs of American Indian youth and tribal communities. Working with other community leaders she helped create the Virginia Tribal Education Consortium ("VTEC"). May was unanimously elected as the inaugural Chair for the Board of Directors. In that role, she helped forge a partnership between the Commonwealth of Virginia, establish tribal education codes and apply for federal funding for the program.

A fellow member of the organization, Dr. Michael Pavel, describes the work May has done at VTEC.

> Conceptualizing, implementing, and administering an educational consortium is a complex responsibility fraught with many details that became especially challenging because of the pandemic. Dr. Edwards demonstrated extraordinary leadership as the VTEC Board Chair and step forward on numerous occasions to represent the interests of Virginia Tribes with area school districts, the Governor's Office, Virginia Department of Education, and the United States Department of Education's Office of Indian Education. At the same time there were many day-to-day details and activities that Dr. Edwards attended to with grace and determination coupled with a pleasant demeanor and kind heart. Among the most admirable qualities that I saw repeatedly was a generosity of spirit because she was always willing to be of service, to speak highly of people, acknowledge what is going right, and recognize what needs to be done.

Letter of Dr. Michael Pavel to the Court, attached hereto as Exhibit MM. Sam Redding, the Chief Learning Scientist at the Academic Development Institute, also worked with May on VTEC. He echoes these sentiments:

> Dr. Edwards worked closely with the VTEC administrators and board, as well as served as a conduit of communication with the five Tribes and a link to the Virginia Department of Education. I have had the opportunity to engage in the launching of many organizations and programs over my career, and rarely have I had the benefit of leadership, intelligence, and commitment that Dr. Edwards has exhibited.

Letter of Sam Redding to the Court, attached hereto as Exhibit NN.

On September 29, 2020, the grant application May spearheaded was funded. The group will receive $1,492,577.00 over a three-year period.

This was a volunteer position. May spent hundreds of hours working on this project. She did not do it for money or glory or for any reason other than she was brought up to help others, and she has embraced this ethic and consistently applied it throughout her life.

Several Tribal members also have written to the Court to bear witness to what May had done for other American Indians:

> She has always been involved in the cultural grown and advance of her Tribe, never hesitating to volunteer her time and energy to advance the goals and dreams of her Tribe and all Native people of Virginia. She has made the Tribal communities extremely proud of her achievements both intellectually and emotionally.

Letter of W. Frank Adams, Chief of the Upper Mattaponi to the Court, Exhibit A.

> I am Susan Smith, a federally recognized member of the Nansemond tribe, and friend to Dr. May Edwards for over fifteen years. I first met May while attending a pow-wow held by the Chickahominy tribe many moons ago. My first impression of her was that of a kind, caring soul; an impression that has stuck with me throughout time.
>
> May has always been a light in the lives she has touched, a truly helpful, giving person. Both of our tribes, as well as others, have been enriched and nourished by her presence and will continue to do so thanks to the guidance and leadership she imparts. She is always happy to help and is the first one to step up during difficult times.

Letter of Susan Smith to the Court, attached hereto as Exhibit OO.

May has lived her whole life this way. As Wendy Sours, May's sister-in-law states in her letter to the Court, May "continually puts the needs of others first and always takes the time to listen to them. Her compassionate spirit runs deep, and you know that if you call, she will be the first one there, regardless of what is happening in her own life." Letter of Wendy Sours to the Court, attached hereto as Exhibit PP. When she was young "she spent countless hours volunteering as a tutor, coaching sports and working at the Special Olympics." Letter of Nick Sours, Exhibit C. This behavior has continued throughout her life. She helped friends with sick children get a bit of relief. She provided a colleague with PTSD a willing ear to talk about his experiences. She listened patiently. She mentored other younger

employees. She dropped everything to help a nephew complete his college application. She encouraged a relative to return to get her college degree and provided support to help her finish the program.

Cultural Anthropologist and Professor Emerita at Old Dominion University Helen Roundtree, who has known May from the day she was born, provides an apt summary of the type of person May is, why she is the person she is and how she has lived her life:

> The family she comes from is hard-working and scrupulously honest, something that is true of most of that tribe. They place a high value on education, so I was not surprised when her mother told me she'd completed a Ph.D. They are also people who emphasize community service and personal responsibility for the welfare of family, friends, and neighbors. *Mayflower fits firmly within that framework.* She chose a career in law enforcement as a result of her upbringing, and her family has all along been immensely proud of her making that choice.

Letter of Helen Roundtree to the Court, attached hereto as Exhibit QQ (emphasis in original).

A consistent picture of Dr. Natalie May Sours Edwards emerges from the many letters that  have been written on her behalf, her work evaluations from three different federal agencies, her academic records and her history of helping others. S-----'s friend, Briana, succinctly distills the essences of May in a short phrase: She is a "light in such a dark world." Exhibit U.[9]

---

[9]Additional letters from family and friends of May Sours Edwards are attached hereto as Exhibits SS (Letter of Jeff L. Brown to the Court); TT (Letter of Julie Ballowe to the Court); UU (Letter of Lisa Ancarrow-Maltby to the Court); VV (Letter of Michele Upshur to the Court); WW (Letter of Henry Johnson, Jr. to the Court) and XX (Letter of Ted Gravetti to the Court); YY (Letter of Timothy Smith to the Court); ZZ (Letter of Sherry Dean Moore to the Court); and AAA (Letter of Danny McQuillen to the Court).

II.    **THE OFFENSE CONDUCT**

The question, of course, arises why someone with such an exemplary background – a history of personal and professional accomplishment, a demonstrated record of helping others, a deeply ingrained morality – stands before this Court to be sentenced for having committed a serious federal offense. The answer is complicated.

Dr. Edwards began her job at FinCEN with excitement. She was taking on a new challenge, and she was working with some people she knew from the intelligence community. Her first year was what she had hoped for: interesting work, smart colleagues and less commuting. As 2015 came to an end, Dr. Edwards began to wonder if she had made a mistake by coming over. She had a concern about whether the Office of Intelligence and Analysis ("OIA") was complying with security procedures mandated by the Treasury Department and the Intelligence Community.

A brief explanation of the Treasury Department's organizational structure is relevant. The Office of Terrorism and Financial Intelligence ("TFI"), is one of four Offices that report directly to an Undersecretary of Treasury. OIA is a component of TFI that is responsible for TFI's intelligence functions. TFI also oversees FinCEN, which administers the Banking Secrecy Act ("BSA").[10]

---

[10]The Currency and Foreign Transactions Reporting Act of 1970, commonly referred to as the Bank Secrecy Act, requires certain businesses, including financial institutions, to collect and provide data to FinCEN, particularly with respect to cash transactions exceeding $10,000 and other financial dealings that appear suspicious. 31 U.S.C. §§5311-5314.

By April of 2016, TFI was considering a proposal to move several employees from FinCEN to OIA. May Sours Edwards and other members of FinCEN's upper management questioned the legality of the proposed realignment. In an email to John Farley, Acting Director of Executive Office for Asset Forfeiture (TEOAF), Dr. Edwards raised concerns about whether the transfers would be consistent with Congressional appropriations and whether OIA was moving forward in spite of a direction from the Senate Select Committee on Intelligence not to proceed until the Committee had reviewed the plans for the reallocation of funds. Email of May Edwards to John Farley, Sr., dated August 11, 2016, attached hereto as Exhibit CCC. On August 27, 2016, employees of FinCEN were instructed via email not to speak with members of Congress. *See* Footnote 13, *infra*.

After making repeated attempts to have the impropriety of the proposed realignment addressed internally, Dr. Edwards became convinced that OIA was going to do something she believed was improper: proceed to detail FinCEN employees to OIA prior to fulfilling Congressional requirements. Feeling she had no alternative, she reached out to members of Congress. One email she sent to a staff member of the Senate Select Committee on Intelligence documents her concerns:

> I really appreciate your prompt response. For full transparency, I do want you to know that I have declared whistle-blower protection. I have also reached out to the SSCI Majority Staff Director, HPSCI Minority Budget Director, Senator Appropriations Majority Clerk, and House Banking Committee. I could no longer stand by watching this unfold, watching FinCEN managements voices being ignored at TFI, Congressional directions being ignored, potential augmentation of appropriations, and potentially having our folks put in a situation that I know was wrong. I am willing to discuss this matter further.

Email of May Edwards to Jon Rosenwasser, Senate Select Committee on Intelligence, dated September 16, 2016, attached hereto as Exhibit DDD. The same day Dr. Edwards and a colleague spoke by telephone with then Representative Michael Fitzpatrick of the House Committee on Financial Services. She discussed her concerns about the legality of the proposed alignment and the ability of FinCEN to enforce the Bank Secrecy Act.

In a September 20, 2016, meeting with the Assistant General Counsel of OIA and others, Dr. Edwards found additional reason to be alarmed. She attempted to vocalize her concerns about the proposed realignment: Moving employees from FinCEN to OIA to assume OIA authorities and work would be inconsistent with the budget Congress had approved for Treasury. She raised another issue during the meeting: Did OIA, as a member of the intelligence community, have the authority to collect and retain data domestically. Under Executive Order 12333 ("E.O. 12333") IC entities, which OIA is, are permitted to collect information on "United States persons" only if the organization has promulgated guidelines for doing so and had them reviewed and approved by the Attorney General.[11] Dr. Edwards questioned whether OIA had signed guidelines. Counsel for OIA hostilely, in Dr. Edwards' estimation, disagreed with her interpretation of EO 12333. She believed he deliberately denigrated her during the

---

[11]Executive Order 12333 provides in pertinent part as follows. "2:3 *Collection of Information*. Agencies within the Intelligence Community are authorized to collect, retain or disseminate information concerning United States persons only in accordance with procedures established by the head of the agency concerned and approved by the Attorney General, consistent with the authorities provided in Part 1 of this Order."

meeting in front of the other participants in an attempt to bully her into agreeing with his position. She did not acquiesce.

On September 22, 2016, Treasury Secretary Jacob Lew testified before the House Financial Services Committee. https://www.c-span.org/video/?415661-1/secretary-jack-lew-testifies-financial-stability-report&start=9046. Representative Fitzpatrick specifically asked him whether the proposed realignment was consistent with the existing budget, the issue Dr. Edwards had been raising. He also the Secretary whether there were any whistleblowers at Treasury. Representatives Jeb Hensarling and Sean Duffy later sent a follow-up congressional letter to Secretary Lew, expressing concern that the proposed "changes may violate appropriations requirements, civil service rules, and constraints on gathering and use of financial intelligence data." They also noted that it was "troubling that Treasury is moving forward with the proposed reallocation with the intention to complete the process before a new Administration takes over in January 2017 and despite bipartisan requests to process at a more deliberate pace." *Id*.

Something else of significance happened during the hearing. In response to a question from Representative Fitzpatrick, Secretary Lew stated that he was unaware of any whistleblowers in the Treasury Department. Dr. Edwards was taken aback and concerned. She was a whistleblower, a fact well known to Treasury OIG.

On September 27, 2016, a week after the contentious OIA-FinCEN meeting, someone at OIA ordered that Dr. Edward's SCI (Sensitive Compartmentalized

Information) clearance and her access to the SCIF (Sensitive Compartmentalized Information Facility) be revoked. Dr. Edwards questioned the basis for the action. Her clearance was reinstated the following day. Email of September 28, 2016, from May Edwards to Elizabeth Ortiz, attached hereto as Exhibit XX.

On September 28, 2016, Dr. Edwards contacted Elizabeth Ortiz, Director of FinCEN's Office of Equal Employment Opportunity and Diversity ("EEO"). In an email to Ms. Ortiz, Dr. Edwards explained that she was a whistleblower, and she felt harassed, intimidated, and bullied by a very senior official in Treasury during a meeting on September 20, 2016. *Id*. on October 4, 2016, Dr. Edwards met with Ms. Ortiz and another member of the Human Resource Office staff and asked to file a harassment complaint against the OIA Assistant General Counsel.

Throughout the end of 2016 and into 2017, staffers from House and Senate Committees continued to request information from Dr. Edwards about whether Treasury was ignoring Congressional mandates. She spoke to or provided information to staffers with the Senate Select Committee on Intelligence, the Senate Appropriations Committee, the House Permanent Select Committee on Intelligence, and the House Committee on Financial Services. On February 27, 2017, a staffer with the House Committee on Financial Services sent Dr. Edwards an email, asking if she knew whether Treasury was ignoring Congressional letters that had requested information from the Department.

Dr. Edwards continued working with staff members from the House and Senate, but she grew frustrated by the pace of their investigations. Nothing was changing at Treasury.

On March 23, 2017, Dr. Edwards, and a colleague who also was a senior official at FinCEN, filed a formal complaint with the Office of Inspector General Department of the Treasury ("OIG"). They asked that Treasury OIG refer their formal complaint to the United States Office of Special Counsel ("OSC").[12] Dr. Edwards and her colleague alleged that the Treasury Department had engaged in various types of misconduct, including obstructing the work of Congress by giving "[f]alse and misleading statements in briefings and during testimony[]" and by collecting and "mishandling" U.S. Persons (BSA data) in violation of E.O. 12333.

On May 23, 2017, Dr. Edwards herself filed a complaint with OSC, alleging that she had been retaliated against for her activities as a whistleblower. The agency defines its role as follows: "OSC is an independent agency that protects federal employees from 'prohibited personnel practices,' including whistleblower retaliation and unlawful hiring practices such as nepotism. OSC also provides an independent, secure channel for disclosing and resolving wrongdoing in federal agencies." https://osc.gov/Agency. If it finds merit to a case, OSC can pursue the claims on an individual's behavior to the Merit System Protection Board.

In her OSC complaint, Dr. Edwards alleged that she had been retaliated against for reporting actions by components of the Treasury Department that she believed were illegal or improper. She cited several examples of such conduct: OIA's attempts to reassign FinCEN employees to OIA, OIA's collection of U.S. person data, testimony by Treasury Secretary Lew to Congress that there were no

---

[12]The Office of Special Counsel is distinct from the Special Counsel's Office, which conducted the probe of possible Russian interference in the 2016 presidential election.

whistleblowers at FinCEN and attempts by agency leaders to prohibit FinCEN employees from talking with Congress.[13]

While OSC was considering Dr. Edwards' allegations, additional conflict was developing between FinCEN and OIA. To fulfill its statutory duty to provide information to members of law enforcement and the IC, FinCEN analysts need access to FinCEN's own data bases, as well as to data bases maintained by other members of the IC. The Treasury Department uses a public key infrastructure ("PKI") system to authenticate users and thereby protect access to its data.[14] Accessing classified data bases requires a user to have an IC (Intelligence

---

[13]By letter dated May 21, 2018, OSC informed Dr. Edwards that they were closing her file. OSC concluded that Dr. Edwards' reports to her "leadership, OIG, Congress and OSC all likely constitute 'protected activity' or whistleblowing under the law." May 21, 2018, letter from OSC to Dr. Edwards, attached hereto as Exhibit HHH at 4. Further, Dr. Edwards could establish that her "management knew about [her] whistleblowing regarding, at a minimum, the issues [she] raised directly to them." However, OSC made several findings that it concluded were fatal to Dr. Edwards' claim that she had been retaliated against as a whistleblower. OSC could not find that there was a substantial likelihood that Treasury Secretary Lew knew of Dr. Edwards' allegations when he testified before Congress that there were no whistleblowers in Treasury. *Id*. at 3. The email that outlined OMB's direction to Treasury on communicating with Congress about the FinCEN/TSI realignment was not improper because it appeared to be directing Treasury officials not to discuss the issue in their *official* capacities as opposed to directing them in their individual capacities on their rights to report suspected wrongdoing to Congress *Id*. With respect to Dr. Edwards' allegations about the IC PKI revocations described *infra* at 42 to 45, and the propriety of the proposed Treasury realignment, OSC deferred to the OIG's findings articulated in its audits of October 17, 2017, and April 8, 2018, described herein at 46, 48, n17.

[14]A more complete explanation of a PKI is as follows: "The purpose of a PKI is to facilitate the secure electronic transfer of information for a range of network activities such as e-commerce, internet banking and confidential email. It is required for activities where simple passwords are an inadequate authentication method and more rigorous proof is required to confirm the identity of the parties involved in the communication and to validate the information being transferred." https://en.wikipedia.org/wiki/Public_key_infrastructure.

Community) PKI certificate – a long, random numerical sequence roughly equivalent to a password. The authority for issuing and renewing IC PKIs rests with OIA's Office of Special Security Programs ("SSP").

In mid-2017, FinCEN employees began to be locked out of the IC PKI system. Dr. Edwards and others raised this problem internally and warned that if FinCEN's access to the IC databases were not restored, FinCEN's ability to respond to immediate requests for information, such as might occur during a terrorist attack,[15] would be severely compromised. The problem was not remedied. When terrorist attacks occurred in Manchester, England, on May 22, 2017, and London on June 3, 2017, the issue had not been resolved. Dr. Edwards was the FinCEN "Action Officer" on duty for the weekend of the London attacks. She was deeply frustrated and beyond angry. She believed that FinCEN's efforts to provide timely information to law enforcement had been stymied by the limited access to IC PKI certificates and that national security had been endangered as a result.[16] Dr. Edwards made this clear in internal emails, including to Richard Delmar, then the Treasury Department's Whistleblower Ombudsman. She asked him to share the information with the Treasury Inspector General, Eric Thorson. Email to Delmar, attached hereto as Exhibit III.

---

[15]By analyzing the information that financial institutions provide to FinCEN in "Suspicious Activity Reports – SARs" and other documents, FinCEN can track financial transactions that may have been used to fund terrorist activity. When if find such evidence, FinCEN provides it to the appropriate United States law enforcement agency or foreign partner.

[16]This information is a matter of public record. See *Audit of the Office of Intelligence and Analysis' Management of the Office of Terrorism and Financial Intelligence Employee's Intelligence Community Public Key Infrastructure Certificates*, October 30, 2017.

Prompted by complaints from Dr. Edwards and others at FinCEN, "a staff member of the U.S. House of Representatives Committee on Financial Services Subcommittee on Terrorism and Illicit Finance, expressed concerns to OIG about whether OIA initiated a mass revocation of FinCEN's intelligence community public key infrastructure (IC PKI) certificates that prevented FinCEN employees from effectively responding to law enforcement requests on the London and Manchester terrorist attacks [on May 22 and June 3, 2017, respectively]." Office of the Inspector General Department of the Treasury, *Audit of the Office of Intelligence and Analysis' Management of the Office of Terrorism and Financial Intelligence Employee's Intelligence Community Public Key Infrastructure Certificates*, October 30, 2017. https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%20Testimonies/OIG-18-044.pdf.

In response to that inquiry, Treasury OIG began an audit – an evaluative report – on this issue. In the summer of 2017, Treasury OIG circulated a draft of the audit. The audit found that in April and May of 2015, "Treasury had to issue new IC PKI certificates when Treasury's external service provider completed a service upgrade. One of the changes made with the upgrade was a shorter expiration period for the IC PKI certificates, going from 3 to 2 years." *Id*. at 4. Because of the changes, an unusually large number of Treasury employees needed new IC PKI certificates at the same time in April, May or June of 2017. A reminder was sent to OIA employees that their IC PKIs were expiring. No reminder was sent to FinCEN employees:

> In 2017, when the IC PKI certificates issued in 2015 expired, SSP did not timely notify all user that their certificates were expiring. While

> SSP notified OIA employees in advance of the IC PKI certificates
> expiring, other employees within TFI were notified as their certificates
> were expiring or after their certificates expired…. SSP did not send
> notifications to many other TFI IC PKI certificate holders, including
> the 25 FinCEN employees whose certificates expired in May and
> June 2017, until after their certificates expired. Immediately after the
> London terrorist attack on June 3, 2017, some FinCEN employees
> whose IC PKI certificates had expired were notified.

*Id*. at 6. While finding that the problem with the IC PKI certificates was solely the
result of inadvertence, the author of the audit did note that "the present working
relationship between OIA and FinCEN related to the IC PKI process is strained."
*Id*. at 3. The two Treasury components had a "fundamental disagreement" about
FinCEN's need for access to the IC PKIs and more broadly about FinCEN's
autonomy. *Id*.

To Dr. Edwards and others at FinCEN who shared their feelings with her, it
was the "fundamental disagreement" about FinCEN's autonomy that explained the
lack of access to the IC PKI certificates. To them, the official explanation was not
persuasive, particularly in view of the fact that FinCEN employees had previously
been told that the "snafu" had been caused by delays resulting from the Treasury
Department realignment. Dr. Edwards sought to demonstrate to OIG that the
audit's conclusions were incorrect. She had little hope that she would be
successful. When the final audit was released at the end of October, none of the
corrections Dr. Edwards and her colleagues at FinCEN had suggested had been
accepted.

In July of 2017, Dr. Edwards was introduced to Jason Leopold, a reporter
at BuzzFeed News, an online publication. By that point Dr. Edwards was convinced
that components of the Treasury Department had engaged in and were still

45

engaging in improper behavior. Going through the channels – declaring as a whistleblower with OIG, filing a formal complaint with OIG and seeking to have OSC pursue her case – had yielded no results. Although Congress by then had done little to curb Treasury's behavior, Dr. Edwards continued to believe that the only way to ensure that those responsible for the improper behavior were held accountable was through Congress. Leopold encouraged this belief: By writing articles, he could get the proper attention for the issues she believed were of vital importance to national security. This was a theme he returned to more than once when he sought information from Dr. Edwards: He could use what she gave him to write stories that would force Congress to investigate her allegations. (September 27, 2017: "We do need to keep momentum going so this story is crucial." October 16, 2017: "We are going for the next story – keep momentum going with 12333." January 11, 2018: "Listen, I am going to make a case that we need to leak something and report it. I am going to reach out to some of your colleagues. But this is getting ridiculous and I need to get their attention…By their attention I mean Congress).

The first article Leopold wrote using information provided by Dr. Edwards and *eleven other* unnamed sources at FinCEN who shared her view – *US Intelligence Unit Accused of Illegally Spying On Americans' Financial Records* – did not contain any SARs-derived information. The story addressed whether OIA was complying with the requirements of E.O. 12333, which Dr. Sours Edwards had brought up at the September 20, 2016, meeting with the Chief Deputy Counsel for OIA. The article incorporated Dr. Sours Edwards' view of what had happened. In

fact, the opening line of the story summarized a widespread belief at FinCEN that what OIA was doing was improper: "Over the past year, at least a dozen employees in another branch of the Treasury Department, the Financial Crimes Enforcement Network, have warned officials and Congress that US citizens' and residents' banking and financial data has been illegally searched and stored." Jason Leopold and Jessica Garrison, *US Intelligence Unit Accused of Illegally Spying On Americans' Financial Records,* BUZZFEED NEWS, Oct. 6, 2017. https://www.buzzfee.dnews.com/article/jasonleopold/us-intelligence-unit-accused-of-illegally-spying-on.

The article had the desired effect. It generated interest from Congress. The Chairman and Ranking Member of the U.S. Senate Committee on Finance, demanded an explanation from Treasury OIG. This triggered an audit of the.12333 issue. *Audit of the Office of Intelligence and Analysis' Authorities and Actions Related to U.S. Persons' Financial Information*, dated April 8, 2018. https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%20Testimonies/OIG-18-044.pdf.[17]

---

[17]The audit concluded that OIA was not acting improperly. The legal basis for this conclusion is startling. The OIG found that, as Dr. Edwards' had suspected, OIA did not have signed guidelines. ("OIA's USP Procedures have not been approved by the Attorney General as required Executive Order (EO) 12333.") Audit of April 8, 2018, at 3. However, the OIG concluded that E.O. 12333 permitted OIA to "legally collect, retain, and disseminate USP information until its USP Procedures are approved." Although E.O. 12333 was promulgated in 1981, it "does not prescribe a deadline for approving USP procedures and instructs IC elements that until its USP procedures are approved, USP activities shall be conducted in accordance with the agency's existing procedures or requirements established under EO 12333." *Id*. at 3. In other words, OIA was not violating E.O. 12333, even though in the *thirteen years* between its creation in 2004 and the 2018 report, it had not gotten around to obtaining signed AG guidelines as required by E.O.

In addition to her concern about OIA's handling of realignment and the PKIs issue, Dr. Edwards grew to question whether FinCEN was providing complete information in response to Congressional requests for information. She was not alone in that belief. On May 10, 2017, Senator Ron Wyden made a floor statement placing a hold on the nomination of Sigal Mandelker for the position of Under Secretary of TFI. His office issued a statement explaining the Senator's reasoning:

> Senator Ron Wyden, D-Ore., today placed a hold on the nomination of Sigal Mandelker to be Under Secretary of the Treasury for Terrorism and Financial Intelligence. Wyden said he will maintain that hold until the Treasury Department provides the Senate Intelligence Committee and Senate Finance Committee information and documents related to Russia and its financial dealings with President Trump and his associates. On Tuesday, May 9, Senate Intelligence Committee Vice Chairman Mark Warner announced that the Committee had made a request to the Treasury Department's Financial Crimes Enforcement Network (FinCEN).

https://www.wyden.senate.gov/news/press-releases/wyden-announces-hold-on-treasury-nominee-until-administration-produces-documents-on-russian-dealings-with-trump-associates. On September 22, 2017, Senator Wyden put a hold on

---

12333. The audit did "recommend that as expeditiously as possible the Under Secretary for Terrorism and Financial Intelligence ensure that (1) OIA's USP Procedures are finalized and submitted for approval to the Attorney General and (2) OIA implements a compliance monitoring program to assess whether intelligence analysts' activities are conduct in accordance with OIA authorities and electronic searches and other queries are performed in a manner that fully protects the rights of U.S. persons." Audit of April 8, 2018,  at  3-4.

It's worth noting, however, that years earlier on October 2, 2013, the Privacy & Civil Liberties Oversight Board wrote the Office of the Director of National Intelligence that "12333 guidelines should be kept up to date. Public concern about government surveillance … it is crucial the documents which provide a framework for the conduct of the intelligence activities by U.S. Intelligence agencies be updated to reflect those developments."

another Treasury Assistant Secretary nominee, Isabelle Patelunas, again because of Treasury's "refusal to provide documents related to Russia." https://www.wyden.senate.gov/news/press-releases/wyden-announces-hold-on-treasury-nominee-over-agencys-refusal-to-provide-documents-related-to-russia.

Leopold fostered Dr. Edwards' belief that Congress was being misled. In a communication over WhatsApp on September 26, 2017, he told Dr. Edwards that he had "just got back info from [Senator Ron] Wyden's folks. They are convinced Jamal [El-Hindi, Deputy Director of FinCEN] is lying."[18] In a communication on October 13, 2017, Leopold told Dr. Edwards that "Wyden was livid." Leopold passed along a message he purportedly had received from Senator Wyden for her: "Please communicate to this Whistleblower that he or she has my full support and is a true champion of Justice. I and my staff will do everything in my power to help this person." According to Leopold, Senator Wyden believed that FinCEN was not turning over Suspicious Activity Reports – SARs – and other documents the Committee had requested about possible Russian interference in the 2016 Presidential Election. Leopold wrote to Dr. Edwards on WhatsApp, purportedly quoting Senator Wyden: "My fear is that what has been turned over to the FBI has not been shared with the [Senate Select] Committee [on spite of

Throughout 2017 and 2018, Leopold told Dr. Edwards in their WhatsApp conversations that he was committed to her cause of uncovering and remedying corruption in the Treasury Department. He told her at times that he was acting on

---

[18]The WhatsApp communications between Dr. Edwards and Jason Leopold consume more than 2400 pages. The document can be provided to the Court if having it would be useful.

behalf of Congressional staff members in seeking information from her. He sought to arrange meetings for Dr. Edwards with members of Congress or their staff. Such meetings did take place. Leopold attended meetings with Dr. Edwards. Staffers encouraged Dr. Edwards to provide information they sought about the inner workings of the Treasury Department, including whether the requirements of the Bank Secrecy Act were being enforced by financial institutions as required to assist U.S. government agencies.

This is only a thumbnail view of what led up to the offense conduct. The many thousands of pages of discovery turned over by the government in this case document a complex and tortured relationship between Dr. Edwards, many of her colleagues, and some of the upper level officials at FinCEN and OIA. The material also shows that a more nuanced relationship existed between Jason Leopold and Dr. Edwards than is traditional between reporter and source. He told her that he was helping her pursue her goal of rooting out corruption and protecting national security.

None of this is offered to excuse the offense conduct. Dr. Edwards provided Jason Leopold with SARs of her own volition. He did not force her or trick her. He used the material to publish articles. She read the articles and provided more SARs. However, it is equally important that the Court understand her perceptions and motivations.

The government's view – that she was hoping to lead a coup at FinCEN so she could be appointed Deputy Director – is not supported by the evidence, or logic. In its objections to the PSR, the government quoted a portion of a

conversation between Leopold and Dr. Edwards to make this assertion: "Oh and while we are on the wish list…I want to be Deputy Director of FinCEN so tell the powerful people to make that happen…" PSR at 23. The full quotation provides a different context: "Oh and while we are on the wish list…I want to be Deputy Director of FinCEN so tell the powerful people to make that happen because I can run that operational bureau better than any of those assterds and I have the qualifications to do it. Yeah let me dream about that."

Dr. Edwards not only believed that the people who were running Treasury were doing a very bad job, in her view some members of the Department were violating the law. Policies and practices were putting American lives at risk. The privacy of the American people – an almost reverence for which had been imprinted on her during service in the IC – was not being respected. Many times, in the thousands of WhatsApp exchanges Jason Leopold, she expressed this view in language any of us might use in what we believed was a private exchange but would not want attributed to us in public. Dr. Edwards hoped those who had been her nemeses at Treasury would lose their jobs or be prosecuted for their conduct. She made that vividly clear in her WhatsApp exchanges with Leopold. However, none of these statements can reasonably lead to the conclusion that Dr. Edwards was a power-hungry conniver who was making up accusations to get a promotion. Nor can anything in Dr. Edwards' background of service to her country and devotion to her family, friends and community support it. Indeed, dozens of times in the WhatsApp exchanges Dr. Edwards is explicit about her motivations. She repeatedly expressed her concern for the country's well-being. If FinCEN were not

able to effectively aid law enforcement, terrorist activity might go undetected. If Congress did not have the information it needed for proper oversite, the American system of checks and balances would be thwarted.

These beliefs, whether misguided or directly on target, motivated her actions.

### III.   THE GUIDELINE RANGE AND SENTENCES AVAILABLE

Dr. Sours Edwards faces no mandatory minimum term of incarceration. As discussed above, the relevant range under the United States Sentencing Guidelines, both as stipulated in the plea agreement and as determined by United States Probation, is zero to six months. PSR at ¶4, p. 28. Probation has recommended that the Court sentence Dr. Sours Edwards to a two-year term of Probation. PSR at p. 29.

### IV.   OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Probation suggests that during any term of supervision, Dr. Edwards be subject to one standard and one special condition that she asks that the Court modify. First, Probation recommends that Dr. Edwards be ordered to "participate in an outpatient mental health treatment program as approved by the United States Probation Office." PSR at 31. As described *supra*, *see* Exhibit JJJ, Dr. Edwards is in individual therapy with Dr. Mariano Piedra. They have a good working relationship, and Dr. Edwards wants to continue receiving treatment from him, rendering the condition unnecessary. Standard Condition 10, as worded, is also

problematic. The condition requires in part that Dr. Edwards not own possess *or have access to* a firearm. Dr. Edwards' husband is a retired police officer. He is licensed by the state of Virginia to carry a firearm. Given that the two reside together, this condition would prevent him from having a firearm because as a co-resident of the home, she would in theory "have access to" the firearm. If this condition were reworded to prevent Dr. Edwards herself from possessing or having a firearm, or her to require her husband to keep the firearm locked – which she advises that he already does - her husband's rights could be protected and the spirit of the goal of the condition satisfied.

## V.   <u>WHAT SENTENCE IS APPROPRIATE IN THIS CASE</u>

Of course, this Court must ultimately decide on a sentence that is "sufficient, but not greater than necessary," to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public and to provide the defendant with needed educational or vocational training, medical care or other correctional treatment." 18 U.S.C. §3553(a). For all the reasons detailed above, it is respectfully submitted that a sentence of time served would meet these standards.

A sentence of time served would be sufficient to punish Dr. Edwards for her criminal conduct and to express societal disapproval of her behavior. She has already suffered severe consequences as a result of her actions. The case received extensive publicity. Her fellow employees at FinCEN, her family, all her friends and, of course, her daughter, learned of her arrest. While May's family views her conduct as an act of conscience and continues to support her, indeed is

proud of her, not everyone has been so kind. Members of the news media have repeatedly tried to contact her family. Her family has been threatened. Her husband and her daughter are in therapy to cope with the trauma of the arrest and its aftermath.

Dr. Edwards is also being treated. Her psychiatrist, Dr. Mariano Piedra, notes that Dr. Edwards "has suffered significant hardship and stress as a result of work-related issues and legal ramifications. She has suffered significant psychological, social, physical, and financial distress and has developed a multitude of symptoms[.]" Letter of  Dr. Mariano Piedra to the Court, attached hereto as Exhibit JJJ. Dr. Piedra lists some of Dr. Edwards' current psychological issues: anxiety with panic attacks, depression, persistent sleep problems, irritability, inability to focus, difficulty making decisions, rapid heart rate, sadness and a sense of hopelessness. This is not an inclusive list. Exhibit JJJ at 1-2.

Additionally, Dr. Edwards was suspended without pay from her employment with FinCEN immediately following her arrest in October of 2018. Her arrest, and the resulting investigation, hastened her husband Dave's retirement from the Richmond Police Department. This loss of income forced the couple to sell their family home. For fourteen months they had to live with Dave's sister and her family. Exhibit DD. They sold the car Dave had bought May as a gift. The family even had to get rid of S-----'s beloved horse, Diva. *Id*.

Dr. Edwards has already been severely punished for this offense.

Of course, there is no reason to conclude that Dr. Edwards needs to be deterred from offending in the future. For the first 40 years of her life, she did

exactly what any government could hope a citizen would do. She worked hard to get a good education. She dedicated her professional life to public service. Her performance was consistently outstanding. She developed and maintained an intimate relationship. She had a child and was a fabulous, caring mother. She helped others – fellow students, relatives, neighbors, co-workers – achieve their potential. She was an avid volunteer and mentor. She preserved the traditions of her America-Indian culture.

For similar reasons, there is no reason to believe that Dr. Edwards poses any danger to the public.

A sentence of time served also would best meet Dr. Edwards' ongoing need for medical care. Dr. Edwards suffers from a variety of serious medical issues, which are described in detail in a letter her treating physician has submitted to the Court. Exhibit KKK, Letter of Dr. Ibrahim Hegab, attached hereto.

## **CONCLUSION**

May Sours Edwards' friend, former police officer, Demetrium Melton, eloquently stated what all her family and friends urge the Court to consider: "I ask that you show mercy upon her as you process your decision Understand that she isn't perfect because she is human just like all of us. God didn't create man or woman to be perfect. He creates us to live our lives knowing that mistakes would happen and we are to ask for forgiveness." Exhibit GG. it is respectfully submitted that a sentence of time served is the appropriate sentence to impose in this case.

Dated:   October 12, 2020
         New York, New York

Respectfully submitted,


_____/s/_____
Stephanie M. Carvlin


cc:    AUSA Daniel Richenthal
       AUSA Kim Ravener (via ECF)