

Financial Crimes Enforcement Network
U.S. Department of the Treasury

*Washington, D.C. 20220*

October 26, 2020

The Honorable Gregory H. Woods
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: *United States v. Natalie Mayflower Sours Edwards*
    *19-cr-0064 (GHW)*

Dear Judge Woods:

The Financial Crimes Enforcement Network (FinCEN) submits this statement for the Court's consideration in sentencing Defendant Natalie Mayflower Sours Edwards (hereinafter Defendant or Edwards).  Defendant, formerly a senior advisor in the Intelligence Division at FinCEN, used her position of trust to amass a vast amount of highly sensitive financial intelligence, including Suspicious Activity Reports (SARs), that she unlawfully disclosed to a media outlet.  When unauthorized SAR disclosures occur, the foundation of trust and confidentiality upon which the Bank Secrecy Act (BSA) regime rests is gravely affected, and the collaborative efforts to protect our national security and financial systems are undermined.

This statement provides the Court with a brief overview of FinCEN and its mission, the importance of BSA confidentiality, and the substantial and negative effect of Defendant's criminal conduct.  As explained below, the unprecedented nature and scope of Defendant's unlawful disclosure has caused incalculable damage to FinCEN's ability to fulfill its national security and law enforcement mission, its access to critical financial intelligence supporting that mission, and the law enforcement and national security investigations into the malign activities revealed by such financial intelligence.

## I.   FinCEN's Mission

FinCEN, a bureau of the U.S. Department of the Treasury, plays two critical roles in the U.S. national security apparatus.  FinCEN is the primary regulator and the administrator of the BSA, part of the comprehensive legal architecture in the fight against money laundering and its related crimes, including terrorism.[1]  FinCEN is also the Financial Intelligence Unit, or "FIU," of

---

[1] 31 U.S.C. § 310(b)(2).

the United States.  In this capacity, FinCEN exchanges financial information with approximately 170 counterpart FIUs around the world to combat money laundering and its related crimes, including the financing of terrorism, and other offenses.  FinCEN also provides support to U.S. law enforcement, intelligence, and regulatory agencies through the sharing and analysis of financial intelligence that FinCEN collects under the BSA.

The reach, speed, and accessibility of the U.S. financial system make it an attractive target to money launderers, fraudsters, terrorists, cyber criminals, rogue states, transnational organized crime syndicates, gangs, and other malign actors.  The financial intelligence that institutions report to FinCEN under the BSA is a key component of our efforts to identify and disrupt illicit finance threats, and our success depends heavily on financial institutions fully complying with the BSA laws and regulations designed to protect the financial system.

The BSA is the nation's most comprehensive federal anti-money laundering and countering the financing of terrorism statutory framework.  Pursuant to the BSA, financial institutions are required to file different types of reports with FinCEN and retain records that have a high degree of usefulness in criminal and civil investigations and proceedings.[2]  To facilitate government use of these reports and records, by statute, FinCEN is vested with the authority to "[m]aintain a government-wide database and access service, with access, in accordance with applicable legal requirements, to…[i]nformation collected [under the authority of the BSA]."[3]  Finally, FinCEN is authorized to administer and enforce compliance with the BSA.[4]

Pursuant to this authority, FinCEN enforces compliance with regulations requiring banks and other financial institutions[5] to implement measures to detect and protect against financial and related crimes.  These regulations include the requirement that financial institutions file SARs.[6] Financial institutions are required to file SARs when the financial institution knows, suspects, or has reason to suspect that a transaction meets a statutory threshold amount and (1) involves funds derived from illegal activities, or is intended or conducted to disguise funds or assets derived from illegal activities; (2) is designed to evade the requirements of the BSA or implementing regulations; or (3) has no business or apparent lawful purpose, or is not the sort of transaction in which the particular customer would normally be expected to engage, and the financial institution knows of no reasonable explanation for the transaction after examining available facts.[7]

---

[2] 31 U.S.C. § 5311.

[3] 31 U.S.C. § 310(b)(2)(B).

[4] *Id.* at § 310(b)(I).

[5] These include casinos; money services businesses; brokers and dealers in securities; mutual funds; insurance companies; futures commission merchants and introducing brokers in commodities; dealers in precious metals, stones, and jewels; operators of credit card systems; loan and finance companies; and housing government sponsored enterprises.  31 U.S.C. § 5312(a)(2).

[6] *See* 31 C.F.R. § 1020.320 (Banks); 31 C.F.R. § 1021.320 (Casinos); 31 C.F.R. § 1022.320 (Money Services Businesses); 31 C.F.R. § 1023.320 (Brokers or Dealers in Securities); 31 C.F.R. § 1024.320 (Mutual Funds); 31 C.F.R. § 1025.320 (Insurance Companies); 31 C.F.R. § 1026.320 (Futures Commission Merchants and Introducing Brokers in Commodities); 31 C.F.R. § 1029.320 (Loan or Finance Companies); 31 C.F.R. § 1030.320 (Housing Government Sponsored Enterprises).

[7] *E.g.,* 31 C.F.R. § 1020.320(a)(2).

## II.        Confidential Nature of Suspicious Activity Reports

SARs are a critical tool for collecting financial intelligence information under the BSA. SARs are afforded significant legal protection from disclosure. A SAR, and any information that would reveal the existence of a SAR, are confidential and cannot be disclosed except as specifically authorized by law,[8] and violations of the SAR provisions, as the instant case clearly underscores, expose a violator to criminal liability.[9]

The public policy underlying SAR confidentiality serves critical regulatory, law enforcement, and privacy objectives. Notifying the subject of a SAR of its existence or content can impede an investigation leading to the destruction of evidence, the chilling of potential witnesses, expose the reporting financial institution and its personnel to harm, and encourage SAR subjects to divert funds and continue potentially unlawful activity, among other things. In addition, rigorous nondisclosure requirements protect individual and corporate privacy and due process interests. A SAR is not a report of confirmed illegal activity; rather, it identifies suspicious activity based upon a financial institution's reasonable assessment of available information. The subject of a SAR may have a legitimate basis for the identified conduct, and therefore, should be protected against unauthorized exposure that could damage an innocent person's reputation.

## III.       Consequences of Unauthorized SAR Disclosures

The BSA compliance regime seeks to prevent money laundering and its related crimes, including the financing of terrorism, and other illicit financial activity, both domestically and abroad. Its success depends upon the collective trust and commitment of financial institutions, law enforcement, civil regulators, and international partners that accurate information will be exchanged freely and maintained in confidence. FinCEN is the steward of this effort. It is critical that FinCEN maintain the confidentiality of SARs as they are the foundation of the BSA regime, which protects our national security and people from harm.

### a)  Impact on Financial Institutions

Financial institutions are on the front lines of domestic and international efforts to combat criminal activity. FinCEN, and its domestic and international regulatory and law enforcement partners, rely on financial institutions to timely and accurately report instances of suspicious financial activity by filing SARs in order to identify, deter, and disrupt criminal activity. Ensuring the confidentiality of SARs is essential to maintaining this candid and free flow of critical financial intelligence. The scope of this undertaking is vast. The approximately 155,000 regulated financial institutions (in the U.S. alone) file an average of 2.8 million SARs annually, with banks accounting for well over half of them. When SAR information is mishandled, it erodes public confidence in the financial sector's—and FinCEN's—ability to safeguard private financial information. Moreover, the reporting financial institution's security, and that of its personnel, is jeopardized when SAR information is improperly disclosed, producing a chilling

---

[8] 31 U.S.C. § 5318(g)(2); 31 C.F.R. § 1020.320(e).
[9] 31 U.S.C. § 5322(a).

effect not only on financial institutions' willingness to file SARs, but also to generate SARs that contain sufficiently detailed, and thereby useful, information.

>   b)  *Impact on Law Enforcement and Civil Enforcement Efforts*

Law enforcement and civil regulatory agencies like FinCEN rely heavily on SARs and other BSA information to identify financial links to illicit activity, and thereby detect and deter domestic and international illicit actors, including terrorists. SARs, in particular, are used to generate leads, initiate new cases for investigation, and support ongoing investigative efforts. An average of 30,000 searches of the BSA database are conducted each day by approximately 12,000 law enforcement and other authorized government agencies nationwide. Countless investigations are originated and informed by the sensitive and confidential information included in SARs and other BSA reports. Unauthorized disclosures of this protected material undermine ongoing law enforcement investigations and can result in the destruction of evidence, witness intimidation, and other serious consequences.

>   c)  *Global Impact*

Just as illicit finance knows no borders, the exchange of financial intelligence to combat illicit finance is global. FinCEN and financial intelligence units around the world work together every day to exchange significant intelligence in support of law enforcement efforts. Such international cooperation is anchored in trust that each country will handle the information appropriately, as well as confidence that the systems used to transmit and store the information are secure. Unauthorized disclosures by senior inside officials, such as Defendant, undermine FinCEN's relationships and can cause irreparable harm to the United States' reputation and operational partnerships with foreign stakeholders.

## IV.   Defendant's Unauthorized SAR Disclosures

Defendant was a senior adviser to the head of FinCEN's Intelligence Division, the largest FinCEN component and the preeminent global authority on illicit finance. The Intelligence Division carries out FinCEN's statutory responsibility to collect and analyze relevant data and produce financial intelligence for its internal and external stakeholders. Thus, the Intelligence Division is the very unit charged with the analysis of SARs and other highly-confidential BSA information. Specifically, the Intelligence Division analyzes SAR and other confidential reported information to identify illicit financial actors and networks to provide financial intelligence to other FinCEN components, law enforcement, regulators, the intelligence community, foreign partners, policy makers, and the financial industry.

As a senior advisor to the head of the Intelligence Division, Defendant was responsible for providing expert and comprehensive counsel on all aspects of the Division's responsibilities. This included developing and implementing oversight programs and policies to ensure compliance with the law. Defendant's position required an FBI background check, a TS/SCI security clearance, relevant training, and an oath of office, as she was entrusted with unique and unfettered access to FinCEN's repository of financial intelligence. By virtue of her position of trust, Defendant understood the innermost operations of the United States' financial intelligence

system, an advantage she ultimately exploited for criminal purposes.  Indeed, Defendant's actions are a breach of trust that is unprecedented in FinCEN's 30-year history.

Defendant's involvement and complicity in the offense charged are beyond dispute—she admitted to this Court to knowingly and willfully removing from FinCEN confidential financial intelligence in protected SARs and leaking this information without authorization to a media outlet, violating both the law and her sworn oath of office.  In doing so she caused significant harm.  FinCEN's reputation and its ability to carry out its critical regulatory and law enforcement mission has been affected.  Domestic and international law enforcement efforts to combat money laundering, the financing of terrorism, and other illicit activity have been undermined.  There has been a chilling effect on the financial sector's willingness to comply with its BSA reporting and compliance requirements in a fulsome and candid manner.  The effect on the general public is also substantial, as it erodes confidence in the governmental and financial safeguards in place that consumers rely upon to protect financial information from being disclosed and used for nefarious ends.  In short, Defendant's conduct affected FinCEN, law enforcement, financial institutions, our global partners, and society as a whole, collectively weakening our national and economic security in the process.

## V.  Conclusion

It is difficult to quantify how many sensitive, ongoing investigations were impacted by Defendant's unauthorized SAR disclosures, or the extent to which important investigations or prosecutions were impacted or never initiated because of her release of confidential information.  Recent news reports of SAR disclosures are instructive and underscore the wide-ranging and serious impact of unauthorized disclosures when further disseminated by third parties with no responsibility to the public or oath of accountability.  Such is the case with Defendant and her unauthorized disclosures to a media outlet that published sensitive and protected information that was never intended for public consumption.

Because of the seriousness of Defendant's breach, and the far-reaching consequences of her actions, FinCEN requests that the Court impose a significant sentence of incarceration that will stress the seriousness of this offense, and deter Defendant and others from engaging in similar criminal conduct in the future.

Sincerely,

Kenneth A. Blanco
Director
Financial Crimes Enforcement Network