# LAW OFFICE OF STEPHANIE M. CARVLIN

140 Broadway, Suite 4610
New York, New York   10005

STEPHANIE M. CARVLIN, ESQ.

TELEPHONE: 212-748-1636
FAX: 212-858-7750
E-MAIL: CARVLIN@HOTMAIL.COM

November 14, 2020

Honorable Gregory H. Woods
United State District Court
Southern District of New York
500 Pearl Street
New York, NY   10007

    Re:    <u>United States v. Natalie Mayflower Sours Edwards</u>
              19-cr-00064 (GHW)

Dear Judge Woods:

    Dr. Natalie Mayflower Sours Edwards served this country honorably and at substantial cost to herself and her family for almost a decade before she engaged in the conduct that gave rise to this prosecution. In urging this Court to impose a "significant period of incarceration", the government entirely ignores this fact and portrays Dr. Edwards as a conniving partisan who disclosed confidential information to the press to get a better job at FinCEN. The evidence proves that her motives were different: She was deeply committed to ensuring the safety of America, and she concluded, after unsuccessfully trying to raise the issues that concerned her through internal channels, that the only way to expose what she believed to be corruption within the Treasury Department and hold those accountable was to work with Jason Leopold (Reporter-1) and with members of Congress. She had no legal right to disclose SARs, but she should be sentenced with a clear understanding of her actual motivations.

<u>Dr. Edwards' Motivation for Working with a Reporter</u>

    Dr. Edwards' motivation for working with BUZZFEED NEWS reporter Jason Leopold are proven beyond doubt by the 2400-plus pages of her written exchanges[1] with Leopold over

---

[1] The WhatsApp communications between Dr. Edwards and Mr. Leopold are covered by the protective order the Court issued in this case and may not be filed publicly. However, I can provide the material in electronic form if the Court would like to review the material.

WhatsApp from July 22, 2017, through October 15, 2018.[2] She was worried that FinCEN and OIA were being operated in ways that would ultimately harm the American public. She believed the analyst at FinCEN were being stymied in their ability to do their jobs by the limitations on their access to intelligence-community databases. The privacy of the American people was being threatened by OIA's failure to obtain signed Attorney General guidelines to govern their collection of data. The security of information FinCEN guarded was being compromised by some employees' use of throw away Google accounts to send work-related emails. The Treasury Department was withholding SARs and other documents requested by Congress.

Dr. Edwards did not choose the press as her preferred method of addressing problems at the Treasury Department. This was a battle she had been fighting for well over a year before she first met Leopold. Beginning in early 2016, she repeatedly reported her concerns about the proposed realignment of the Office of Intelligence and Analysis ("OIA") to senior officials at Treasury. In a September 26, 2016 meeting with Chief Counsel for OIA and others, Dr. Edwards expressed her belief that OIA could not legally collect "U.S. person" information because the organization did not have Attorney-General signed guidelines as required by Executive Order ("E.O.") 12333. In the fall of 2016, she met with staff members from the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence to discuss this and other issues related to what the Treasury Department was doing. In March of 2017, she filed a "whistleblower" complaint with then-Treasury Department Inspector General Eric Thorson. In May of 2017, she filed a complaint with the Office of Special Counsel.

Ultimately, Dr. Edwards concluded that none of the entities she had reported her concerns to was going to investigate them properly. She wanted to protect the American people by changing practices at FinCEN that she thought were dangerous. She believed that Leopold could help her achieve this goal, which was a belief that he encouraged. In one of their first

---

[2]There is nothing nefarious about using an encrypted message service. Indeed, in their February 2017 guide for whistleblowers, *Speaking Truth to Power*, Congressmen Ted Lieu and Don Beyer advised that chat "apps that end-to-end encryption are a safe bet, like WhatsApp, Signor, or Telegram." https://lieu.house.gov/sites/lieu.house.gov/files/Federal%20 Employee %20Resources.pdf.

The government seems to argue that Dr. Edwards' use of WhatsApp demonstrates consciousness of guilt. It does not. Certainly, Dr. Edwards did not want anyone at FinCEN to know that she was speaking to a reporter. This was not because she intended to send Leopold SARs when she first began communicating with him over WhatsApp in July of 2017. Given that Dr. Edwards had already expressed her disapproval to her superior in FinCEN of several practices that components of the Treasury Department were engaging in and had, in her opinion, been retaliated again as a result, she had good reason to try to keep her contacts with Leopold private.

This Court should draw a different conclusion from Dr. Edwards' use of WhatsApp. She was telling Leopold the truth when she said her goal was to protect this country. Because she was communicating with Leopold privately and had no expectation that her messages would ever become public, she had no reason to falsely represent her motivations in her conversations with him.

exchanges over WhatsApp, he promised to "*reach out to some folks I know in senior roles at Justice.*" Communication of July 27, 2017, at 1:56:51 PM (UTC+0). Dr Edwards' response: "*Thank you, share what you know will get this moving. I will testify publicly or behind closed doors, it doesn't matter to me because the American people come first*[.]"[3] Communication of July 27, 2017, at 1:58:34 PM (UTC+0).

That was why she began working with Leopold, as she told him over-and-over:

*I need someone to meet w me, a Chairman or Senator, as I have now brought forward danger to the American people and from my optics no one is holding these people accountable.*

Communication of October 20, 2017, at 12:33:17 PM (UTC+0).

*I hope its worth it in the end. :) … Which I know it will be for the American people.*

Communications of October 26, 2017, at 2:21:47 and 2:21:55 AM (UTC+0).

*…I could not standby while illegal activity was taking place.*

Communication of October 27, 2017, at 2:23:13 AM (UTC+0).

*Yes, terrorist attacks, and NOTHING done. NOTHING … not even by Congress that I can see. \*\*\* The blood is on their hands. \*\*\* I tried to help the American people.*

Communications of November 21, 2017, at 2:12:42 AM; 2:14:03 AM and 2:14:12 AM (UTC+0).

*I will also make it public that staffers blocked my attempt, a Fed WB and American citizens access and right to Senators and committees. They want to play political games ... game on ... this is the safety of American people and I clearly do NOT tolerate that threat.*

Communications of January 16, 2018, at 3:57:41 AM (UTC+0).

*I'm just mad bc I told Congress Treasury didn't hand everything over either*[4] *and I got NO response. … The American people deserve to know.*

Communications of January 26, 2018, at 3:38:23 and 3:28:32 AM (UTC+0).

---

[3] The WhatsApp communications are italicized to help distinguish them from the body of the text.

[4] Dr. Edwards was referring to "Congressional Request Letters" to the Treasury Department through which members of Congressional Committees sought SARs and other information held by FinCEN.

3

> *I just want to keep the American people safe.*

Communication of February 9, 2018, at 5:51:24 AM (UTC+0).

> *I hope you see the 180 in my ... I hope it's clear when people meet me that it's all about protecting the American people and not about me :).*

Communication of September 4, 2018, at 2:16:21 AM (UTC+0).

In its sentencing submission, the government quotes from an exchange between Dr. Edwards and Leopold that the government asserts shows that Dr. Edwards gave him information so she could assume additional power at FinCEN and receive money by bringing a *qui tam* lawsuit. Government's Sentencing Submission of October 26, 2020, at 19 ("Gov. Submission"). Dr. Edwards did believe she could do a better job at FinCEN than those who were then in charge. She would follow the law, as she stated in an October 19, 2017, message to Leopold: "*There is NO leadership. I would pay anything to lead FinCEN for just one month and knock some damn sense into this[5] idiots and tell them NO, we cannot do this [violate the law].*" Communication of October 19, 2017, at 2:30:38 AM (UTC +0).

In the same exchange, Dr. Edwards outlined what she had sacrificed as a result of her mission to expose what was going on at the Treasury Department and, yes, her hope that she would be compensated:

> *.... I want the OSC file I submitted provided to Jeff Sessions as OSC is supposed to do when a criminal complaint with substantial evidence is brought forth ... I will never give up but how much do I have to sacrifice with my career, stress, family, and the financial strain of a high power attorney, which by the way the whistleblower law is suppose to cover attorney fees and provide maximum thirty percent for the qui tam whistleblower.*

*Id*.

Dr. Edwards was frustrated with what she perceived to be an unwillingness by the people who were responsible for investigating her complaints to take them seriously. In her estimation she had been retaliated against repeatedly for raising concerns about what was going on at Treasury.

> *And to be frank, I would NEVER have come forward in the IC [Intelligence Community] with what I have brought forth at Treasury and I followed the entire government process and have been well documented retaliated against the entire time, almost giving up, but I didn't [sic] for the American people and I still have not*

---

[5]The WhatsApp communications are quoted with the original typographical and grammatical errors.

> *been helped at ALL, except by an investigative journalist, who had enough faith in this unbelievable, complex, misuse use [sic] of all personal practices, and grave danger to National Security. And it still hasn't been resolved, instead we have the Acting Director of OIA, Acting Director of FinCEN, TFI, MT, CC, and the IG running around trying to find out who talked to ODNI, who talked to Congress, who talked to the reporter.*

10/19/2017, at 2:30:38 AM(UTC+0).

She often expressed anger in her messages with Leopold. She described some officials at FinCEN and OIA in unflattering terms. She repeatedly stated that she hoped they would lose their jobs or be prosecuted for what they were doing. The fact that she held those feelings, however, does not change the reality that her goal was to expose what she believed were potentially dangerous practices at the Treasury Department and have those individuals held accountable for their actions. In fact, before going to the press, she had complained loudly, publicly and repeatedly within FinCEN about what she believed was wrong. This was hardly the path someone would take if they wanted to advance within an organization.

<u>Why Doctor Edwards Provided SARS to A Reporter</u>

When they first began communicating, Dr. Edwards did not give Leopold any SARs. In fact, she requested that he keep the documents she did send to him confidential. He promised he would. Dr. Edwards: "*Sending ya another of the 7 [documents that were filed as part of my OSC complaint] that might get Someone in DOJs attention to if you mention some of it. Don't give this and please hold tight as with the other one ...*" He responded that he would "*keep everything very close*" and would "*also reach out to my staffer contacts on the Hill.*" Communication of July 27, 2017, at 2:00:58 PM (UTC+0). Communication of July 27, 2017, at 2:01:58 PM (UTC+0).

Dr. Edward grew to trust Leopold. His initial articles about the Treasury Department – written before Dr. Edwards provided him any SARs – concerned the issues she had sought to raise internally. In an article posted on September 27, 2017, Leopold and co-author Jessica Garrison wrote about one of the problems that most concerned Dr. Edwards: FinCEN analysts' lack of access to the digital keys – PKIs – that enable them to use classified databases to conduct their reviews. Jason Leopold and Jessica Garrison, *In Midst of Terror Attack, US Intel Unit Was Blocked From Tracking The Terrorists,"* BUZZFEED NEWS, September 27, 2017. https://www.buzzfeednews.com/article/jasonleopold/us-intelligence-unit-was-blocked-from-tracking-terrorists. This problem had not been resolved by June 3, 2017, when a terror attack took place on London Bridge. The article reported that "the lack of access for personnel within the Financial Crimes Enforcement Network – never before reported – cost antiterrorism forces on both side of the Atlantic crucial time in identifying and responding and pursuing the people and networks around the attackers[.]" *Id*. The articles cited "sources and documents." *Id*. One document referenced was a letter Representative Steve Pearce, then chair of the House Subcommittee on Terrorism and Illicit Finance, wrote to Treasury Secretary Steven Mnuchin. Pearce wrote that because analysts didn't have the PKIs "FinCEN was unable to effectively

respond to critical, time-sensitive requests for information from law enforcement partners, including the Federal Bureau of Investigations." *Id*. This was exactly what Dr. Edwards had been saying internally to the relevant FinCEN officials.

On October 6, 2017, BUZZFEED NEWS took up another issue that Dr. Edwards had sought to press: OIA's failure to obtain signed AG guidelines for collection of US person data as required by E.O. 12333. Leopold and Garrison wrote that "Treasury employees alleged" that OIA had "been illegally rifling through and filing away the private financial records of U.S. citizens." Jason Leopold and Jessica Garrison, *US Intelligence Unit Accused of Illegally Spying on Americans*, Financial Records," BUZZFEED NEWS, October 6, 2017. https://www.buzzfeednews.com/article/jasonleopold/us-intelligence-unit-accused-of-illegally-spying-on. In that piece, Leopold and Garrison wrote that *ten* sources at FinCEN "have warned officials and Congress that US citizens' and residents' banking and financial data has been illegally searched and stored." *Id*. As the article demonstrates, Dr. Edwards was not the only FinCEN employee who thought something was wrong. At least nine other individuals had reached the same conclusion: There was a problem. It needed to be remedied, and Treasury would take no action absent external pressure. It is hard to believe that nearly a dozen employees at FinCEN had no basis for their conclusions that components of the Treasury Department were engaging in questionable practices. Indeed, one of FinCEN's then-most-senior officials is named as a co-conspirator in Dr. Edwards' Indictment. Either FinCEN made many very bad hiring decisions, or something was amiss.

With these articles and through near constant contact with Dr. Edwards, Leopold fostered in her the belief that her cause was his cause, and that he was the route to bringing the attention needed to force change at FinCEN. She believed that after years of having her allegations met with indifference, she had found someone who shared her sense of urgency about what was going on and could do something about it:

> *Dr. Edwards: And if [in] the end the government and congress fail is [sic] I know the media aka you will make them pay and be there to defend us with your powerful pen and networks.*
>
> *Jason Leopold: Oh you can count on that.*
>
> *Dr. Edwards: There is a story there and no lies on our end. Only the truth and us trying to protect our staff and the American people.*

Communications of July 28, 2017, at 5:11:11 AM; 5:11:28 AM and 5:12:30 AM.

> *Dr. Edwards: Seriously so happy someone sees everything I had to endure to protect our people and the American people. Sorry my burden has been placed on you but so relieved to just tell someone.*

Communication of September 27, 2017, at 12:15:25 AM (UTC+0).

During the 14-month period he communicated with Dr. Edwards over WhatsApp, Leopold repeatedly told her that he would get members of the House and Senate interested in her issues. But the best way to do that was to pressure them by publishing articles in BUZZFEED NEWS:

*Leopold: And seriously. We will be ensuring accountability and Justice. You can be sure of it.*

Communication of September 15, 2017, at 6:00:44 PM (UTC+).

*Leopold: I've asked you to trust me and you have which I have been very grateful for. I told you I would follow this through and do my best to get you attention, justice and accountability. Well, I am asking you again to trust me. I can't provide you with details but I told you I would come through and I told you the Manafort story and those revelations would be what opens the door. When that door is open on February 20, the new publication date, it will result in a separate lengthy piece laying bare all the wrongdoing. All I can tell you is that my editor is phenomenal. We are working with a producer on Tucker Carlson on a joint print/screen story. We are starting tomorrow and I am flying to NY tomorrow for the next couple weeks. I promise you I will not publish anything until you see it. But get ready for prime time. The reckoning is beginning. … I am very good at my job as I know you are at yours. I tried to work getting you the attn internally. But this is the way to go and it will result in the accountability you have sought. You and everyone else will be protected.*

(Communication of January 27, 2018, at 7:14:32 PM (UTC+0).

The government argues that the information Dr. Edwards gave Leopold was unrelated to the issues she had raised as a whistleblower.[6] This argument misses the mark. Leopold told Dr. Edwards that Senator Ron Wyden believed that Treasury Department officials had lied when they asserted they had turned over all the information the Senator had requested as part the Senate's investigation in possible Russian interference in the 2016 presidential election. *See* Communication of October 13, 2017, at 1:42:45 AM (UTC+0). Leopold said that he had a "10-minute off the record convo" with Wyden, and Wyden had raised these concerns:

*Leopold: Wyden believes he is being lied to.*

*Leopold: Staff said Wyden does not like lied to which is why held up nomination.*

---

[6]The government asserts that Dr. Edwards' allegations were "thoroughly examined" by the Treasury OIG. Gov. Submission at 5. Dr. Edwards disagrees. In her estimation, OIG's investigation was cursory. They did not interview her, did not speak to her counsel and did not provide her or her counsel with ongoing information about the course of the investigation. Nor did they provide Dr. Edwards or counsel with a final written report.

Communications of October 13, 2017, at 1:35:51 and 1:36:08 (UTC+0).

> *Leopold:* "*re: SSCI[7] request intel staff has only seen flash reports.*"

Communication of October 13, 2017, at 1:39:08 AM (UTC+0). In Dr. Edwards' estimation *this* was wrongdoing. The fact that it had not been included in her original whistleblower complaint was not the issue. She believed that this was evidence of additional improper conduct by Treasury, and she was going to help the Senator and the reporter uncover and expose it.

With Leopold's reassurance that he would deal directly with Senator Wyden, Dr. Edwards gave permission for Leopold to provide the Senator with information on a variety of topics, including material she had obtained from her review of SARs. Communication of October 13, 2017, at 1:42:17 AM (UTC+0). As the government points out, she did promise to try to find out additional information for Leopold that he could provide to the Senate to prove that Treasury had not made the required disclosures: "*once you chat w Wyden and find out more … then I can dig deeper proving they [the Senate] didn't get all of it.*" Communication of October 13, 2017, at 1:46:41 AM (UTC+0). She believed that what she was doing was right:

> *Dr. Edwards: You must be* [sic] *a surreal moment in your life right now. You have direct convention* [sic] *to a powerful Senator and he is asking when he can call you for more information. And he seeks guidance from you. You should be very proud of yourself! You are serving such a vital role for me and the American people. Your* [sic] *my voice. And we will seek Justice together.*

Communication of October 17, 2017, at 2:08:52 AM (UTC+0).[8]

Nor was Dr. Edwards motivated by a desire to interrupt the Mueller investigation as the government asserts. Gov. Submission at 18-19. Beginning in 2016 and continuing until her arrest, she worked with Congressional staffers on both sides of the aisle: staffers for Senators Orrin Hatch (R), Chuck Grassley (R), Ron Wyden (D), then-Representative Michael Fitzpatrick (R), Senators Mark Warner (D), and Dianne Feinstein (D).

She sent a copy of her complaint, which detailed the problems with the Treasury Department, directly to Special Counsel Robert Mueller, Attorney General Jeff Sessions and

---

[7] Senate Select Committee on Intelligence.

[8] It is worth noting that In a statement he issued last week through a spokesperson the Senator confirmed that he had worked with Dr. Edwards on these issues: "Senator Wyden is deeply concerned about the politization of FinCEN, and took Dr. Edwards' claims very seriously." Ben Hallman, *FinCEN official accused of leaking secret bank records requests time served*, INTERNATIONAL CONSORTIUM OF INVESTIGATIVE JOURNALISTS, October 26, 2020. The Senator stated as well that he did not ask Dr. Edwards to disclose SARs. She does not claim otherwise.

members of Congress. In fact, many of the SARs she turned over to Jason Leopold contained information that was *inculpatory* of some of the targets of the Mueller investigation.

The government's assertion that partisan politics spurred Dr. Edwards' actions is equally unsupported. She did express political opinions (which were often critical of both Democrats and Republicans). However, Dr. Edwards did not disclose SARs and other confidential FinCEN documents to damage an individual or political party as she stated at the time:

> Dr. Edwards: And, this isn't a political issue from my optics. I don't care if they worship fucking goats, I am about the oath I took to the Cons. to protect the American people domestic and abroad.

Communication of October 17, 2017, at 4:22:49 AM (UTC+0).

### Dr. Edwards is Not Seeking to Excuse Her Conduct

None of this is offered as an excuse. Dr. Edwards chose to provide material to Leopold. Nor did she, a trained high-level employee at FinCEN, have any reasonable grounds for relying on Leopold's assurances that what she was doing was right. And, as the government correctly notes, she turned over a vast quantity of documents during the course of more than a year. It was a lot. It was not a one-time transgression[9]. However, this review of a very small portion of the written communications between Dr. Edwards and Jason Leopold provides a context for how she viewed her actions at the time. Dr. Edwards was not looking for financial gain or personal glory. She saw something, and she said something. No one listened. She spoke louder, and still no one listened. She wanted to protect the American people. She wanted to hold those responsible accountable. She thought Leopold had the same goals and together they would expose the corruption at the Treasury Department.[10]

### Dr. Edwards' Work at FinCEN was Outstanding

Stunningly, the government urges this Court to discount Dr. Edwards' years of service at FinCEN on the grounds that she was never a good employee. Gov. Submission at 27. Of course, this assertion is completely at odds with Dr. Edwards' performance evaluations from her tenure at FinCEN, which described her performance as outstanding. Exhibits L and M to Defense Sentencing Submission of October 12, 2020. Dr. Edwards received the same descriptions of her service at ATF and ODNI: outstanding. Exhibits H, I and J to Defense Sentencing Submission of October 12, 2020. At ODNI, she received a letter of thanks from the Chief Human Capital Officer

---

[9] The numbers the government cites in its submission – 50,000 documents – appears to be the number of documents that Dr. Edwards had on the flash drive, not the number she provided to Leopold, which admittedly was vast.

[10] Dr. Edwards acknowledges that she operated under a different duty than Jason Leopold. She worked for FinCEN, an agency that is charged with protecting the privacy of the material that is turned over to it. As Dr. Edwards said more than once in the WhatsApp conversations, she took an oath.

for her, Dr. Edwards', superlative work on a project there. Exhibit J to Defense Sentencing Submission of October 12, 2020.

The bases for the government's claim also do not withstand scrutiny. According to the government, records show that Dr. Edwards' often did not log into her work account when she was teleworking and during one-month in the fall of 2018, she went into her office only three times. Gov. Submission at 27. Dr. Edwards duties did not require her to sign into her work computer on a daily basis. She was a senior employee at FinCEN who advised one of the Associate Directors of FinCEN and provided oversite to analysts who reviewed the material financial institutions submitted pursuant to the requirements of Bank Secrecy Act.

Additionally, Dr. Edwards was hired by FinCEN as a disabled Native America Indian pursuant to 5 C.F.R. 213.3102(u)("Appointment of persons with intellectual disabilities, severe physical disabilities, or psychiatric disabilities").[11] She had an approved reasonable accommodation that permitted her to work at home on a Maxi-Flex or Flexible work schedule. See 5 U.S.C. §6122(a)(1). Employees on a Maxi-Flex schedule are authorized to work fewer than 10 days in a bi-weekly period, provided they work 80 hours total during that time frame.

Equally meritless is the government's assertion that Dr. Edwards must have been a bad employee at FinCEN because she submitted no letters of support from her former colleagues there. This is factually inaccurate. One *retired* FinCEN employee, Jeffrey Gaines, did submit a letter to the Court about Dr. Edwards. Exhibit R to Defense Sentencing Submission of October 12, 2020. He describes her in nothing less than glowing terms:

> First allow me to tell you how our paths crossed and how that led to a solid friendship. I was interviewing for a position in the Intelligence Community. At the time of the interview I had never met May, but she was one of the members of the hiring panel. I was eventually hired by that organization but did not realize how much May championed my hiring by challenging the hiring practices of an organization that needed to hire more minorities. As a result of my onboarding I found myself sitting in an office that was located right next to May and for the next three years we laughed, ate lunch together, bonded, worked on projects and became friends. Over those three years we often shared stories about each of our families. May's face would always light up with a smile when you talked about her daughter. She also wore the proud spouse hat of being married to a law enforcement officer.
>
> Second, as with any career good people tend to move around and May was no exception. May eventually moved to another organization but we stayed in touch.

---

[11]Dr. Edwards fell within the disability category that covers non-paralytic orthopedic impairments, chronic pain, stiffness weakness in bones or joints or some loss of ability to use part or parts of the body.

> That being said, she enjoyed her new job so much that she thought I would love it as well and that I would be a great fit for a position in the organization. Long story short, May championed my hiring again and I was eventually hired by the organization.

The reason why there are no letters from *current* FinCEN employees is entirely obvious. At least nine people in addition to Dr. Edwards provided information to Jason Leopold. *See supra* at 6. Seeing what happened to Dr. Edwards could well give them pause about writing a letter of support for her. People who are still working at FinCEN who did not provide information to Leopold could also reasonably hesitate to show public support for a former colleague who is, to say the least, not in favor with the current senior management.

<u>The Quantity of SARs Dr. Edwards Disclosed</u>

The government argues that because of the quantity of material Dr. Edwards disclosed, "the applicable advisory Guidelines range does not account for the pertinent factors in this case". Gov. Submission at 14. As a result, the government urges the Court to impose a sentence of incarceration that is "substantial." The Court should reject the government's entreaty.

The government entered into a written plea agreement with Dr. Edwards that contained a stipulated guidelines sentencing range of zero to six months. Plea Agreement dated January 3, 2020, at 2, Court Ex. 1 to January 13, 2020 Rule 11 hearing. 19-cr-64 (GHW), document 37. Both parties reserved the right to "seek a sentence outside the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)." *Id*. at 3. Under this reservation clause, the government may legitimately argue for a sentence greater than zero to six months. Of course, a "broad range of sentences" may be reasonable in a given case. *United States v. Jones*, 531 F.3d 163, 178 (2d Cir. 2008). But having agreed to this sentencing range of 0 to six months, the government should not be heard to complain that a sentence within that range would be unreasonable.

Additionally, in reviewing the government's request for a "meaningful term of imprisonment," it should be noted that both grounds on which the government bases this request were apparent at the time it agreed to a stipulated Guideline range of zero to six months. It is accurate, as the government notes in its submission, that the Guideline that covers the offense of conviction, unlike many other Guidelines, does not key offense level to quantity. However, the government agreed that Dr. Edwards could plead guilty to violating 18 U.S.C. §371 with the full understanding of this fact. The Guideline has not changed. Similarly, prior to entering into the plea agreement, the government knew that Dr. Edwards had disclosed a very substantial number of documents.

The Court should not rely on this argument as a basis for determining Dr. Edwards' sentence.[12]

Dr. Edward's Susceptibility to COVID-19 if Incarcerated

It is beyond reasonable debate at this point that the virus that causes COVID-19 is highly contagious, highly deadly and present in federal prisons[13]. Government policy makers, including the United Attorney General of the United States, have acknowledged that the virus has entered the federal prison system and killed inmates. On March 26, 2020, General Barr issued a memorandum to the Director of the Bureau of Prisons ("BOP") to express his view that "at-risk inmates who are non- violent and pose minimal likelihood of recidivism" might be "safer serving their sentences in home confinement rather than in BOP facilities." The Attorney General stated that the BOP should "ensure that home confinement" is utilized, "where appropriate, to protect the health and safety of BOP personnel and the people in [their] custody." https://www.bop.gov /coronavirus/docs/bop_memo_home_confinement.pdf.

In a further directive on April 3, 2020, the Attorney General stated that "upon [his] finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons," he was authorized by the "CARES Act to expand the cohort of inmates who can be considered for home release" and that the "review should include all at-risk inmates—not only those who were previously eligible for transfer." The Attorney General also acknowledged that "[w]hile BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting [its] inmates, those precautions, like any precautions, have not been perfectly successful at all institutions." https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3. pdf.

Courts across the country have also recognized that the COVID-19 pandemic poses a particular danger for inmates. *United States v. Rodriguez*, No. 17-cr-157 (VEC), 2020 WL 3051443, at *2 (S.D.N.Y. June 8, 2020)(describing the "heightened risk" of COVID-19 as "inherent in a

---

[12] The government makes an additional argument that the Court should quickly reject: Dr. Edwards' "drug use." Gov. Submission at 28. In the conversation cited by the government and several conversations that immediately preceded it, Dr. Edwards discussed with her husband taking drugs he provided to her. Dr. Edwards told her husband that her doctor advised her to stop taking immediately. It is clear from the conversation that she did not want to continue to the drug after speaking to her physician. Dr. Edwards was tested for drugs use during her period of pretrial supervision on this case. She also was subject to random drug testing while she worked for ATF, ODNI and FinCEN. She has never tested positive for any illegal substances.

[13] As of November 13, 2020, 231,181 individuals have died in the United States from COVID-19. https://coronavirus.jhu.edu. The BOP reports that as of November 13, 2020, there are currently 3,121 inmates and 1049 BOP staff who have confirmed positive test results. An additional 17,168 inmates and 1,605 staff had COVID-19 and have recovered, while 130 inmates and 2 staff members have died from the illness. https://www.bop.gov/coronavirus. The numbers are rising rapidly. On November 2, 2020, little more than a week ago, the BOP reported that 1,796 inmates and 911 BOP staff had confirmed positive test results.

carcereal setting"); *United States v. Parks*, 456 F.Supp. 3d 557, 560 (S.D.N.Y. 2020)("The nature of prisons – crowded, with shared sleeping spaces and common areas, and often with limited access to medical assistance and hygiene products – put those incarcerated inside a facility with an outbreak at heightened risk."); *United States v. Nkanga*, No. 18-Cr-713 (JMF), 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020)("The country faces unprecedented challenges from the novel Coronavirus pandemic. Those detained in jails and prisons face particularly grave danger."); *United States v. Scparta*, No. 18-Cr-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020)("the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals.") See also letter of Senator Dick Durban (Mar. 23, 2020), *available at:* https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks .pdf. ("Conditions of confinement do not afford individuals the opportunity to take proactive steps to protect themselves, and prisons often create the ideal environment for the transmission of contagious disease.").

Individuals who suffer from certain pre-existing conditions are especially at risk to experience serious or deadly consequences from contracting the illness. The Centers for Disease Control and Prevention ("CDC") notes that adults "of any age with certain underlying medical conditions are at increased risk for severe illness from the virus that causes COVID-19. Severe illness from COVID-19 is defined as hospitalization, admission to the ICU, intubation or mechanical ventilation, or death." https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with- medical-conditions.html. Heart conditions and other cardiovascular and cerebrovascular disease place an individual into the high-risk category. *Id*. While the question has not been studied to conclusion, it also appears that those who have asthma and certain kinds of autoimmune deficiencies may also be "at an increased risk for severe illness from the virus that causes COVID-19." *Id*. *See also Park*, 456 F.Supp.3d at 561 (finding that a "documented history of respiratory issues, including asthma [manifest by life-threatening asthma attacks], and immune-compromising diseases" were medical conditions that made the defendant "increasingly likely to suffer a serious and potentially fatal case of COVID-19, if contracted.").



*See* Medical Records[14] of Natalie Sours Edwards of September 1, 2020, attached hereto as Exhibit A.

---

[14]This is a selection of relevant portions of Dr. Edwards' medical records since 2011 from Bon Secours Hospital. The complete record span 348 pages, which can provided if the Court requests.



The increased risk that Dr. Edwards would contract COVID-19 and become seriously ill in prison is a factor this Court should consider in determining whether a period of incarceration is greater than necessary to meet the goals of 18 U.S.C. §3553(a). Many courts have done so. *See United States v. Ozols*, No. 16-CR-692 (JMF), 2020 WL 2849893 at *4 (S.D.N.Y. June 2, 2020)(considering vulnerability of 42-yearold-old man suffering from anxiety and depression with family history of heart and lung disease in determining whether to grant compassion release); *United States v. Zukerman*, 451 F.Supp.3d 329, 335-36 (S.D.N.Y. 2020)(granting compassion release to 75-year-old man with diabetes, hypertension and obesity). *See also*, *Koon v. United States*; 518 U.S. 81, 111 (1996)(District Court did not abuse its discretion by considering particular vulnerability of inmate to abuse in prison in determining sentence); *see also*, *United States v. D.W.*, 198 F.Supp.3d 18, 23 (E.D.N.Y. 2016)("The trial judge cannot close his or her eyes to the conditions a particular defendant being sentenced will necessarily experience in prison.... the prison environment must be considered by the sentencing judge in estimating total harm and benefits to prisoner and society—a utilitarian as well as a compassionate exercise.").

Conclusion

For all of the reasons stated herein and in Dr. Edwards' initial sentencing submission, a sentence of incarceration would not be appropriate in this case. The government argues that general deterrence demands that a substantial term of incarceration be imposed. Anyone who were to learn of what has already happened to Dr. Edwards in this case would hesitate to follow in her footsteps. It is unlikely that she will ever work in the same type of position again. She and her family had to sell their home. They moved in with relatives for more than a year until the Edwards family could find a far more modest home to rent. Members of the family have received threatening phone calls. They have had to call local law enforcement for to report incidents on more than one occasion. Dr. Edwards is now a convicted felon.

While the government does not address any of this in its sentencing submission, it is clear that Dr. Edwards has already experienced profound consequences as a result of her conduct. If the Court believes that some additional punishment is necessary to provide for general deterrence, then it is respectfully submitted that a sentence that requires Dr. Edwards to complete a substantial term of community service as a condition of supervised release would suit that goal and provide far greater benefit to the public.

Respectfully submitted,

_____/s/_____
Stephanie Carvlin

# EXHIBIT A – REDACTED MEDICAL DIAGNOSIS OR TREATMENT

# EXHIBIT B – REDACTED MEDICAL DIAGNOSIS OR TREATMENT