UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

UNITED STATES OF AMERICA,                         :

       v.                                                              :         Indictment No.
                                                                                                                    19-cr-0064 (GHW)
                                                                      :

NATALIE MAYFLOWER SOURS EDWARDS,           :

            Defendant.                                      :

-------------------------------------------------------------------x


## MEMORANDUM IN SUPPORT OF MOTION FOR SENTENCE REDUCTION

Stephanie M. Carvlin
Counsel for Natalie Mayflower Sours Edwards
140 Broadway, Suite 4610
New York, New York  10005
212-748-1636

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,              :

            v.                         :     19-cr-0064 (GHW)
                                       :
NATALIE MAYFLOWER SOURS EDWARDS,       :
                                       :
            Defendant.                 :
                                       :
------------------------------------------------------------x
```

## **INTRODUCTION**

As of the drafting of this Memorandum (December 31, 2021), Federal Prison Camp Alderson ("Alderson"), where Natalie Mayflower Sours Edwards is serving her sentence, is first in the number of inmates at Bureau of Prison facilities ("BOP") infected with COVID. Of the 677 inmates at Alderson, 194 now have COVID. https://www.bop.gov/coronavirus/. On December 28, 2021, the number as reported on the BOP's website was 111. Infections at Alderson have led to many cases of severe illness: Forbes magazine reported on December 24, 2021, that there were "approximately twelve women who have been hospitalized outside of the facility in the local community, while others remain in the facility in the quarantine unit on oxygen." Walter Pavlov, *The Women's Federal Prison Camp at Alderson In Middle of COVID-19 Outbreak*, FORBES, December 24, 2021. https://www.forbes.com/sites/walterpavlo/2021/12/24/the-womens-federal-prison-camp-at-alderson-in-middle-of-covid-19-outbreak/?sh=5df98e4920c0. This is true in spite of the fact that 507 of the inmates at Alderson, like Dr. Edwards, have been "fully vaccinated" as defined by the BOP. https://www.bop.gov/coronavirus.

Because the new variant of SAR-co-V-2 that now is dominant in the United States – Omicron – is extremely contagious, there is no reason to conclude that this trend will be reversed soon. Indeed, the Centers for Disease Control and Prevention ("CDC") anticipates a surge of cases in the coming days and weeks. "Plausible scenarios include steep epidemic trajectories that would require expedient public health action to prevent severe impacts on the health of individuals and the healthcare system." *Potential Rapid Increase of Omicron Variant Infections in the United States*, Centers for Disease Control and Prevention, Dec. 20. 2021. https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting /mathematical-modeling-outbreak.html. As of December 21, 2021, the CDC predicted that 640,000 to 1,240,000 new cases were likely to be reported in the week ending January 1, 2021. *COVID-19 Forecasts: New Cases*, Centers for Disease Control and Prevention, Dec. 21, 2021. https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/ forecasts-cases.html. Significantly, the CDC believes that the rapid increase is likely "due not only to the increased transmissibility of the Omicron variant but also its ability to evade immunity conferred by past infection or vaccination (i.e., immune evasion)." *Id*. On December 31, 2021, the NEW YORK TIMES reported a 181% increase in reported cases over the previous 14-day period. *Coronavirus in the U.S.: Latest Map and Case Count,* NEW YORK TIMES, Dec. 31, 2021. https://www.nytimes. com/interactive/2021/ us/covid-cases.html.

Dr. Edwards, a first-time offender, has served four of her six-month-term of incarceration under extremely harsh, indeed frightening conditions. As documented in the Presentence-Investigation Report ("PSR") and medical records, she suffers from several medical conditions that render her more likely to suffer a severe course of COVID-19 if

2

she were to become infected. While in Alderson, she is virtually powerless to avoid exposure to the virus. Given all of these circumstances, Dr. Edwards, through counsel, respectfully moves this Court pursuant to 18 United States Code ("U.S.C."), Section 3582(c)(1)(A)(i) to reduce her sentence to time served.

## I. THE STATUTORY FRAMEWORK

Section 3582(c)(1)(A)(i) of Title 18 of the United States Code – the "compassionate-release" statute – grants authority to a District Court to reduce a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction," and the defendant has satisfied an administrative-exhaustion requirement. Additionally, a Court must "consider[ ] the applicable factors set forth in section 3553(a) to the extent that they are applicable before it can reduce the defendant's sentence." *United States v. Jones*, 17 F.4th 371, 374-75 (2d Cir 2021). In deciding a compassionate release motion, a Court may consider "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it]." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020).

## II. EARLY RELEASE IS APPROPRIATE IN THIS CASE

### A. Dr. Edwards Has Exhausted the Administrative-Remedy Requirement

There is no procedural bar to this Court's authority to consider Dr. Edwards' motion. Section 3582(c)(1)(A) requires a defendant to fully exhaust her administrative remedies before seeking a sentence reduction from her sentencing court. Dr. Edwards has done so. On September 10, 2021, she filed a request for compassionate release with the then-Warden of FPC Alderson, M. Carver. Warden Carver denied Dr. Edwards' request by letter dated September 30, 2021. Exhibit A to Carvlin Declaration.

3

B. <u>Extraordinary and Compelling Circumstances Warrant Granting a Sentence Reduction</u>

1. <u>COVID-19 Is Rampant in FPC Alderson, and Dr. Edwards' Medical Conditions Put Her at Higher Risk of a Poor Outcome if She Contracts COVID-19</u>

No Court, likely no living person, needs to be told of the danger posed by COVID-19. The deaths of 5,432,274 individuals worldwide and 824,339 deaths in the United States document the ravages caused by the illness. *COVID-19 Data in Motion: Thursday, December 30, 2021*, JOHNS HOPKINS UNIVERSITY SCHOOL OF MEDICINE/ CORONAVIRUS RESOURCE CENTER, December 31, 2021. https://coronavirus.jhu.edu. "The rapid spread and dangers of COVID-19 are by now part of our collective knowledge." *United States v. Dones*, No. 3:18-cr-00246 (JBA), 2021 WL 6063238, at *2 (D. Conn. Dec. 22, 2021).

It is equally well established that people with certain medical conditions are more likely to get severely ill from COVID-19. *People With Certain Medical Conditions*, Centers for Disease Control and Prevention, Dec. 14, 2021. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html ("People With Certain Conditions"). Severe illness from COVID-19 means risk of hospitalization, admission to an intensive care unit, intubation or mechanical ventilation, and death. *Id*. The conditions that carry an increased risk from COVID include asthma (moderate to severe) and heart conditions. "While the relationship between high blood pressure and COVID-19 is still being studied, there is evidence that high blood pressure increases your risk of infection and the severity of symptoms." Konrad Solberg, *COVID-19 and high blood pressure: Cause for concern?*, VCUHealth.Org., May 19, 2021. https://www.vcuhealth.org/news/covid-19/covid-19-and-

4

high-blood-pressure-cause-for-concern. The CDC notes this as well. (Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) can make you more likely to get severely ill from COVID-19). *People With Certain Conditions. See also United States v. Pellot*, 10-cr-169 (VM), 2021 WL 807242 (S.D.N.Y. Mar. 3, 2021)(noting CDC findings that adults of any age with asthma or high blood pressure may be at increased risk from COVID-19).

High cholesterol also increases the probability that an individual who contracts COVID will suffer severe consequence. Research has demonstrated that individuals with genetically high cholesterol who were infected with COVID-19 experienced more acute myocardial infarctions than individuals who did not have the condition. Kelly D. Myers, et al., *COVID-19 associated risks of myocardial infarction in persons with familial hypercholesterolemia with or without ASCVD*, AMERICAN JOURNAL OF PREVENTIVE CARDIOLOGY (September 2021). https://www.sciencedirect.com/science/article/pii/S2666667721000519?via%3Dihub.

███████████████████████████████████████. The PSR prepared for her sentencing documents that ███████████. The condition was severe enough that prior to her admission to Alderson, she was ████████████████████████████████████ ████████ PSR of June 22, 2021, at ¶¶58, 60. Medical records that list her "active



5

problems" as of August 31, 2021, just prior to her self-surrender at Alderson, state that she ² Patient First Consolidated Continuity of Care Document at 2. Exhibit B to Carvlin Declaration. Dr. Edwards continues to ▮▮▮▮ Medical staff at Alderson ▮▮▮▮ She uses it frequently to deal with the ▮▮▮▮ follows if she walks any significant distance or otherwise exerts herself. Carvlin Declaration at ¶14. She also ▮▮▮▮ *Id.*

These conditions coupled with the prevalence of COVID-19 at Alderson constitute extraordinary and compelling circumstances that grant this Court the authority to reduce Dr. Edwards' sentence to time served.

2. <u>Dr. Edwards Cannot Effectively Protect Herself From COVID-19 While Incarcerated at FPC Alderson</u>

If Dr. Edwards were sentenced to time served and released from BOP custody, she could greatly mitigate the chance of being infected with COVID-19. According to the CDC, "[p]eople in correctional and detention facilities are at greater risk for some illness, such as COVID-19, because of close living arrangements with other people." *FAQs for Correctional and Detention Facilities*, Centers for Disease Control and Prevention (January 26, 2021). https://www.cdc.gov/coronavirus/2019-ncov/community/correction-



6

detention/faq.html. The risk is profound. "American prisons, jails and detention centers have been among the nation's most dangerous places when it comes to infections from the coronavirus." Eddie Burkhalter, et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, NEW YORK TIMES, April 10, 2021. A stunning, "one in three inmates in state prisons are known to have had the virus, the data shows. In federal facilities, at least 39 percent of prisoners are known to have been infected." *Id.*

Regardless of what mitigation steps the BOP has taken or says that it will take, the conditions inherent in imprisonment create the ideal environment for the transmission of contagious diseases. Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases, 1047-1055 (Oct. 2007), https://doi.org/10.1086/521910. The crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease in jails and prisons. Michael Kaste, *Prisons and Jails Worry About Becoming Coronavirus "Incubators"*, NPR, Mar. 13, 2020. https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators, One need not resort to academic sources to reach this conclusion. The number of inmates in BOP facilities who have tested positive since the beginning of the pandemic, and the number who continue to test positive, demonstrates this indisputably.

The fact that Dr. Edwards is fully vaccinated does not change this calculation. Even before the new Omicron variant became prevalent in the United States, the existence of breakthrough infections also was "part of our collective consciousness." Indeed, the fact that Alderson reports 506 "Full Inmate Inoculations Completed" and yet 194 of the 677

7

inmates there – a shocking 28% - are currently testing positive demonstrates that breakthrough infections today are routine.

Additionally, there is near universal agreement in the scientific community that "full vaccination" without a booster shot provides significantly diminished protection from the Omicron variant. Initial data indicates that "there appears to be a significant decline in neutralizing antibodies against the variant in people who have received two shots of an mRNA vaccine." Dr. Francis Collins, *Latest on Omicron Variant and COVID-19 Vaccine Protection*, NIH Director's Blog, Dec. 14, 2021. https://directorsblog.nih.gov/2021/12/14/the-latest-on-the-omicron-variant-and-vaccine-protection/on. The CDC now recommends that *all* adults over the age of 18 receive a booster. COVID-19 Vaccine Booster Shots. Centers for Disease Control and Prevention, Dec. 28, 2021. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html?s_cid=11706:who%20should%20get%20a%20covid%20booster:sem.ga:p:RG:GM:gen:PTN:FY22. While the BOP acknowledges that inmates should receive a third vaccination, Dr. Edwards has not yet received a booster shot, although she has requested one. Carvlin Declaration at ¶14. See *COVID-19 Vaccine Guidance Federal Bureau of Prisons Clinical Guidance, October 13, 2021*. Department of Justice, Federal Bureau of Prisons, October 13, 2021.

Dr. Edwards remains at significant risk if she were to contract COVID. See *United States v. Suggs*, No. 3:99-cr-244 (JBA), 2021 WL 2661874, *5 (D. Conn. June 28, 2021)(while the odds of experiencing severe illness are substantially reduced by vaccines, they are not non-existent, particularly in light of the impossibility of consistent social distancing while incarcerated in a congregate setting.); *United States v. Johnson*,

8

No. 98-CR-860(7) 2021 WL 5755047, at *4-5 (E.D.N.Y. Dec. 3, 2021)(reducing vaccinated defendant's sentence given his obesity and other health conditions); *United States v. Spriggs*, Crim. No. CCB-10-364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021)(the fact that the defendant "received a vaccine didn't negate that his underlying health conditions make him eligible for compassion release."); *United States v. Pappa*, No. 95-00084-CR, WL 1439714, at *4 (S.D. Fla. Apr. 1, 2021)(reducing sentence given ongoing risk of COVID in spite of the fact that the defendant had received vaccination); *United States v. Murakami*, No. 1:17-CR-10346-DPW, Docket Entries 79, 80 (D. Mass. Feb. 25, 2021)(releasing inmate with hypertension who had received one dose of vaccine and would receive a second dose prior to release).

    3.    <u>The Unusually Harsh Conditions of Confinement Dr. Edwards Has Experienced In Combination with the Prevalence of COVID-19 in FPC Alderson Constitute Extraordinary and Compelling Reasons to Grant this Motion</u>

"Courts have granted motions for compassionate release based upon the theory that the COVID-19 pandemic has created disproportionately harsh sentences and limited the rehabilitative resources available to incarcerated people." *United States v. Dones*, 2021 WL 6063238, at *4 (collecting cases)(finding that the "extraordinarily punitive conditions and the lack of rehabilitative services" available to the defendant in "conjunction with his health risks" constituted extraordinary and compelling circumstances); *United States v. Jones*, 3:18-cr-80 (SRU), 2021 WL 1197803, at *6-7 (D. Conn. Mar. 30, 2021)(reducing defendant's 60-month mandatory-minimum sentence to 21 months in part because of the "harshness of incarceration during the pandemic as a result of necessary lockdowns and quarantines"); *United States v. Mcrae*, 17 Cr. 643

(PAE), 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021)("In the Court's judgment, a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison."); see also United States v. Hatcher, 18-cr-454-10(KPF), 2021 WL 1535310, at *2 (S.D.N.Y. Apr. 19, 2021)(granting early release notwithstanding receipt of COVID-19 vaccine because, among other things, defendant "has been unable to receive mental health care, drug abuse treatment, and other important services that the Court envisioned her receiving while incarcerated"); United States v. Foozailov, 17-cr-262 (LGS), 2021 WL 1894273, at *2 (S.D.N.Y. May 11, 2021)(granting a "modest reduction" in sentence to defendant with asthma, hypertension and obesity because of the "harshness" of the sentence because of the anxiety and lockdowns caused by COVID-19 and because of the defendant's worsening visions problems and the facility's treatment of them).

Dr. Edwards has experienced conditions of incarceration at FPC Alderson that constitute extraordinary and compelling circumstances. Coupled with the COVID pandemic and Dr. Edwards' medical problems, they justify a sentence reduction to time served fewer than two months prior to her projected release date.[3]

When Dr. Edwards arrived at Alderson, she was placed in quarantine and stayed there from September 3 until approximately October 15, 2021. During that time, she had to remain within her individual "cubicle" (cell). All her meals were brought in, most often

---

[3] The BOP inmate locate gives Dr. Edwards' projected release date as February 28, 2022.

arriving cold by the time they made their way to her from the "chow hall." Carvlin Declaratio at ¶14.

Although Dr. Edwards is no longer in quarantine, the facility remains on lockdown. In addition to being permitted 45 minutes of recreation a day (when it is provided - it isn't always), inmates are allowed out of their individual units only to go to the chow hall, drop up and pick up laundry and commissary. Commissary has been closed periodically, including continuously for the past two weeks. Inmates are permitted to buy only $180 of products from commissary every two weeks. (The limit was $25 when Dr. Edwards was in quarantine.) Commissary is not a luxury, as inmates are required to provide many of their own necessities. Dr. Edwards has to purchase over-the-counter medication through commissary to treat her diagnosed ▮▮▮▮▮▮▮▮▮▮▮▮ and pain associated with her ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See Exhibit B to Carvlin Declaration at 2. Alderson does not provide treatment for these conditions. In addition, commissary is a vital source of nutrition for Dr. Edwards. She is ▮▮▮▮▮▮▮▮▮▮ a fact noted in the PSR. PSR at ¶58. Many of the meals served at Alderson include milk or cheese or mayonnaise. Dr. Edwards uses much of her limited commissary allotment to supplement her diet.

Inmates in quarantine at Alderson are provided with an unjustifiably low quantity of surgical masks. During the almost six weeks Dr. Edwards was in quarantine, she was given only four masks, which she had to reuse repeatedly. Carvlin Declaration at 14. When she was released from quarantine, Dr. Edwards was given a cloth mask. She has received only two masks since mid-October. She has to wash them in a sink. *Id.* As the number of COVID-positive inmates at Alderson has grown, so has her fear that the inadequate safety measures taken by the facility will lead to her own infection.

11

Additionally, Dr. Edwards' medical needs have not been adequately addressed while she has been incarcerated at FPC Alderson. When she arrived at Alderson, Dr. Edwards had many ongoing medical problems, as reflected in the PSR and her medical records: ███████████████████████████████████████, ████████████████████████████████████████ Exhibit C to Carvlin Declaration at ¶¶6-7. Just prior to surrendering at Alderson, she had received the results of blood tests that included ██████████████████████████ Dr. Edwards was directed to see ████████████ but was unable to do so before entering Alderson. Exhibit D to Carvlin Declaration; Exhibit B to Carvlin Declaration at 4. In addition, she had various ████████████████████████████████████████████████████████████████████████████████████████████████████████████ PSR at ¶61. Dr. Edwards also had been diagnosed with ██████████████████ ████████████████████████████████████████Exhibit C to Carvlin Declaration at 6-7.

The medical staff at Alderson was aware of these issues. Many of them were documented in the PSR, which accompanies all inmates to their designated facilities. See PSR at ¶¶55, 58, 59, 60, 62, 63. In addition, on September 3, 2021, I sent an email to Dana Renick, the Health Service Administrator at Alderson, and attached a copy of Dr. Edwards' medical records (Exhibits B, C, D to Carvlin Declaration), the procedure I had been instructed to follow by counsel at the BOP Designation Center in Grand Prairie, Texas. Carvlin Declaration at ¶¶7-8. In my email to Ms. Renick, I emphasized the fact that Dr. Edwards urgently needed additional testing to determine ████████████████ ████████████████. September 3, 2021 Email to Dana Renick, Exhibit F to Carvlin

12

Declaration.[4] I repeated my concern about Dr. Edwards' ▮▮▮▮▮▮▮ in an additional email to Ms. Renick on September 14, 2021.

In spite of Dr. Edwards' documented medical problems, she was not seen by any member of the medical staff at Alderson until September 29, 2021, more than three weeks after she arrived at the facility. On that date, Dr. Edwards was interviewed by a physician's assistant. Dr. Edwards did not see a physician at Alderson until October 1, 2021. Carvlin Declaration at ¶14. The FPC Alderson Inmate Handbook (2012), provides that inmates will be interviewed by a member of the Health Services staff and be given a medical screening "upon [the inmates'] arrival" at the facility. *Id* at 21. https://www.bop.gov/locations/institutions/ald/ALD_aohandbook.pdf. A physical examination is "to be completed within 14 days of [an inmate's] arrival if indicated." *Id.* at 24. All new inmates are supposed to be interviewed by a clinical psychologist as well. These requirements were not met.

While she has now been evaluated by medical staff at Alderson, and certain blood work has been done, Dr. Edwards has not been seen by a ▮▮▮▮▮▮▮▮▮▮▮ at Alderson. She has not received ▮▮▮▮▮▮▮▮ She has not ▮▮▮▮▮▮▮. While she has been prescribed a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ she has been told she has to purchase medication through commissary to try to manage her

---

[4]Ms. Renick advised me that Alderson would not accept the medical records from me. Rather, Dr. Edwards would have to sign a release of information and staff from Alderson would contact her medical providers directly for the records. 1. Carvlin Declaration at ¶9. Dr. Edwards advised me that she followed this procedure.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
issues.

Dr. Edwards has a hearing impairment. When she arrived at Alderson, she brought a hearing aid and related equipment (sensors, extra batteries) that had been prescribed for her by an audiologist. She was told that she could not bring the batteries and other accessories into the facility. Alderson would provide them. On November 12, 2021, a piece of the hearing aid got stuck in Dr. Edward's ear. She was seen by a physician at Alderson. He removed the piece from her ear. It detached and lodged in ear her again the same day. *Id*. The batteries provided with the hearing aid are beyond their expiration dates of 2016 and 2017, respectively. Carvlin Declaration at ¶14. As a result, the hearing aid does not work properly. Dr. Edwards' hearing has been severely limited since her incarceration. Dr. Edwards addressed this issue with the Warden at Alderson and received no answer.

On November 25, 2021, I wrote an email to then-Warden S. Napier, requesting that Dr. Edwards be provided with a functioning hearing aid. Her hearing impairment constituted a disability within the meaning of BOP Program Statement 5200.05 (October 27, 2017). *See* Email of November 25, 2021, Exhibit E to Carvlin Declaration. I received no response. Dr. Edwards still does not have a functioning hearing aid.

Dr. Edwards has severe problems with her ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

[redacted] Her PSR, as well as her medical records, document these issues. PSR at ¶¶58, 59.

Dr. Edwards was using knee braces and a cane before she began her term of incarceration. When Dr. Edwards arrived at the facility with the knee braces, she was told they could not be bought in. She was allowed to keep her cane until her October 1, 2021 appointment with a physician at Alderson. He dictated that she could no longer use her cane. The "campus" at Alderson is large, and the facility where the inmates must drop their clothing to be washed is some distance from the housing units. The commissary and chow hall are at the same location. Dr. Edwards sought a van pass that would enable her to ride to that building. Her request was denied. As a result, when she is permitted to leave her unit to go to eat in the chow hall or drop off laundry, Dr. Edwards has to walk. This is slow and painful. Carvlin Declaration at ¶14. She has to rely on other inmates to carry her clothing to be washed and to be pick them up after. Other inmates in her unit also retrieve Dr. Edwards' commissary (when it has been available). She cannot handle the additional weight of carrying these items as she walks from her unit to the distant building. *Id.*

---



5 [redacted]

Nor has Dr. Edwards received any care or treatment for her documented ████████████████████████████████████████.

Finally, Alderson has offered no programs while Dr. Edwards has been incarcerated. Family visits have been suspended, and she has not been able to meet in person with her 16-year-old daughter, husband, brother, parents or any other family member for the past four months. Dr. Edwards volunteered to be a Teacher's Aide but because of the pandemic, she has not been able to serve in this position. Carvlin Declaration at ¶14. She has largely sat for months in her cubicle, worrying about whether she will contract COVID and become seriously ill, worrying about whether she is getting proper medical care and worrying about the well-being of her daughter.

### C. The Relevant Factors Under 18 U.S.C. §3553(a)

When extraordinary and compelling reasons are established, 18 U.S.C. § 3582(c)(1)(A) requires a Court to consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted.[6] It is respectfully submitted that the §3553(a) factors weight in favor of reducing Dr. Edwards' term of imprisonment to time served. The seriousness of the offense appears to have been the primary factor that led to the Court's decision to impose a sentence of incarceration on Dr. Edwards, a first-

---

[6] As the Court knows, 18 U.S.C. §3553(a) directs a court to impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate general and specific deterrence, protect the public and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. In so doing, the Court is required to consider the nature and circumstances of the offense, the kinds of sentences available, any pertinent policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentencing disparities.

time offender with a long history of service to her country, family and community. The goals of reflecting the seriousness of the offense, providing just punishment and adequate deterrence and promoting respect for the law will be amply satisfied by requiring Dr. Edwards to serve four months under the abhorrent conditions she has experienced. Nor is there any basis for concluding that Dr. Edwards poses any danger to any member of the community. To the extent that she has any educational, medical or vocational needs, they can best be addressed in the community. She will be on supervised release for three years after she returns home.

When release from prison, Dr. Edwards will again reside with her husband and daughter. She will resume her place in her family and community.

## Conclusion

For the foregoing reasons, Dr. Edwards respectfully requests that the Court reduce her sentence to time served.

Dated: January 3, 2022

Respectfully submitted,

_____/s/_____
Stephanie Carvlin

cc:   AUSA Kimberly J. Ravener
      AUSA Daniel C. Richenthal (via ECF)